**CONSOLIDATED PUBLIC WATER SUPPLY DISTRICT NO. C–1, Plaintiff-Respondent,**

v.

**FARMERS BANK, Defendant-Appellant.**

**No. 47457.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 15, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 28, 1985.

Application to Transfer Denied
April 2, 1985.

Richard D. Shewmaker, Clayton, for defendant-appellant.

Roland A. Wegmann, Mark T. Stoll, Hillsboro, for plaintiff-respondent.

SNYDER, Judge.

Defendant Farmers Bank appeals from a judgment entered on a jury verdict for $207,108.07 in favor of plaintiff Consolidated Public Water Supply District No. C–1 on its claim that the Bank improperly charged the Water District's account for checks paid over forged endorsements. §§ 3–404, 4–401 U.C.C.[1]

The Bank relied on two defenses: first, the "padded payroll" or imposter section of the U.C.C., § 3–405; second, the negligence of the Water District in conducting its business so that an employee could, by forging endorsements, cash checks made out to the Water District's suppliers, § 3–406. The judgment is affirmed in part and reversed and remanded in part.

Bank contends the trial court erred in: (1) overruling its motion for directed ver-

dict; (2) instructing the jury on the definition of good faith; (3) requiring the Bank to follow "reasonable commercial standards" in its instruction on the defense under § 3–405, U.C.C., the imposter section; (4) in instructing the jury on the applicability of § 400.4–406 U.C.C. relating to the time limit on recovery by the Water District for checks with unauthorized endorsements; (5) in refusing to withdraw from the jury's consideration evidence of the Bank's failure to obtain the endorsements of the Water District's manager or other person when he cashed the checks in question, and overruling objections to closing arguments relating to Bank's failure to obtain the endorsements; (6) in refusing instructions which stated the effect of Bank's negligence; and (7) in refusing an instruction regarding a Water District employee's apparent and inherent authority to cash checks on behalf of Water District.

The Water District's motion to dismiss the appeal because Bank's brief fails to comply with Rule 84.04(d) was denied, although appellant Bank's brief was indeed defective under the rule. See *Thummel v. King*, 570 S.W.2d 679 (Mo. banc 1978).

The Bank, however, has filed a motion under Rule 84.08(a), taken with the case, to excuse its partial failure to comply with Rule 84.04(d) and to supplement its brief. The supplement sufficiently corrects the original brief by at least stating specifically what trial court rulings are asserted as error. The Bank's motion to excuse and to supplement its brief is granted.

The facts are essentially undisputed. The Water District is a public consolidated water supply district serving part of Jefferson County. It is a consolidation of Public Water Supply District No. 4 and Public Water Supply District No. 9. The consolidation took place in late 1977.

Floyd E. Sutterfield became the manager of District No. 9 when it was organized in 1966 and he subsequently managed District

1. All Uniform Commercial Code citations may be found in Chapter 400, RSMo.1978. Throughout the opinion sections of the code may be referred to without the U.C.C. or Chapter 400 designation.

No. 4, in addition to District No. 9, for a fee, under an agreement between the two districts, which were consolidated in 1977 as Consolidated Public Water Supply District No. C–1. Mr. Sutterfield continued to manage the consolidated district until early 1980.

The Water District was governed by a five member board of directors which met once a month. The manager, through the employees of the Water District, carried on the day-to-day operations including the ordering of supplies and materials and the paying of the bills.

The Water District maintained checking accounts at the Bank.

Authorization to pay Water District bills came from the board of directors through ordinances which were passed at the monthly meetings. The ordinances were submitted to the board of directors in folders which contained the invoices from creditor suppliers, and the checks made out in payment of the invoices.

The practice was for the manager to make out the check stubs showing to whom the check should be made out and the purpose, such as meter supplies, insurance premiums, engineering services or other supplies. The women in the office, referring to the check stubs, would then type up the ordinances and the checks which were presented to the board of directors at the monthly meetings.

After the ordinances were passed, the chairman and the treasurer would sign the checks which were then turned over to the manager for mailing, or as it developed in some cases, for cashing.

The manager of Water District denied it at trial, but someone submitted for the Board's approval ordinances for the payment of bills supported by duplicates of invoices which had already been paid or were to be paid on future ordinances, and sometimes even supported by purported bills from creditors typed on Water District stationery. The evidence, except for the manager's testimony, was that the manager took the ordinance folders to the board meetings and presented them to the directors in nearly all cases.

The chairman and the treasurer signed the checks after the ordinances were passed and gave the files to the manager. The manager or some other person then forged the endorsements of the payees and received cash for the checks at the Bank, where the tellers did not require the manager or other person to endorse the checks. The person cashing the checks routinely asked for large bills. The checks varied in amounts from less than $200 to as much as $2,400, increasing in amounts as the scheme continued. In short, this case presents the classic "fictitious payee" or "padded payroll" case. See UCC § 3–405, Comments. The procedure was the same for all three districts.

I. MOTION FOR DIRECTED VERDICT

The Bank's first contention is that the trial court erred in denying its motion for a directed verdict because the evidence established Bank's defenses based upon §§ 3–405, 3–406, and 4–406.

In deciding whether the trial court erred in overruling a motion for a directed verdict the evidence is viewed most favorably to the party opposing the motion. *Green v. Crunden Martin Mfg. Co.*, 575 S.W.2d 930, 932[1] (Mo.App.1978). One who has the burden of proof on an issue ordinarily is not entitled to a directed verdict where his proof rests on oral testimony. Where the opponent in his pleadings or by counsel admits the issue, however, or by his evidence also establishes the first party's claim, or where there is no real dispute about the basic facts, supported by uncontradicted testimony, essential to a claim or affirmative defense, the party with the burden of proof may be entitled to a directed verdict. *Rogers v. Thompson*, 364 Mo. 605, 265 S.W.2d 282, 286–287 (1954).

A drawee bank may debit its customer's account only for checks which are "properly payable." § 4–401(1) UCC. Checks paid over forged endorsements are

not ordinarily properly payable because § 3–404 renders a forged endorsement wholly inoperative as the signature of the actual payee. *Western Cas. and Sur. Co. v. Citizens Bank of Las Cruces*, 676 F.2d 1344, 1345[1] (10th Cir.1982); *Kraftsman Container Corp. v. United Counties Trust Co.*, 169 N.J.Super. 488, 404 A.2d 1288, 1290 (1979).

The Bank paid the checks drawn on the Water District's account over forged endorsements. Unless another provision of the Uniform Commercial Code shifts the risk of the forged endorsements, the Bank is liable to the Water District for the amounts it paid on the checks. The Bank relies on either § 3–405, the "padded payroll" section, or § 3–406, the negligence section, for its defense.

### A. SECTION 3–405(1)(C) UNIFORM COMMERCIAL CODE

■ "An endorsement by any person in the name of a named payee is effective if ... an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest." § 3–405(1)(c) UCC. Official Comment 4 to § 3–405 makes it clear that in the so-called padded payroll cases, the risk of loss shifts from the drawee, here the Bank, who would ordinarily bear the loss under §§ 4–401 and 3–404(1), to the drawer, the Water District:

Paragraph (c) is new. It extends the rule of the original Subsection 9(3) to include the padded payroll cases, where the drawer's agent or employee prepares the check for signature or otherwise furnishes the signing officer with the name of the payee. The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee.

The present case fits within § 3–405(1)(c). The Water District's employee supplied it with the names of creditors, who had already been paid, or who would in the future be paid on another ordinance, not intending that the creditors would actually have any interest as payees. After the checks were written out, the employee took them, forged the endorsements and cashed the checks. This accords with the testimony of the tellers, although the manager denied it. Cf. *Clinton Weilbacher Builder, Inc. v. Kirby State Bank*, 643 S.W.2d 473 (Tex.App.1982).

■ The Water District argues that § 3–405 is inapplicable because the forged endorsements were not in the name of the named payee. For § 3–405 to be applicable the forged endorsements must be exactly the same as the named payees. *Twellman v. Lindell Trust Co.*, 534 S.W.2d 83, 92–93[13, 14] (Mo.App.1976).

■ This court has examined the checks upon which Water District brought suit and has determined that all but four contain endorsements in the name of the named payee.[2] These checks, with a combined value of $2,795.68, fall outside § 3–405(1)(c) and are, therefore, not properly payable. Section 3–405 is applicable to the rest of the checks.

**2.** These checks are:

| YEAR | EXHIBIT NO. | AMOUNT | NAMED PAYEE | ENDORSEMENT |
|---|---|---|---|---|
| 1975 | P–5 | $286.68 | Layne Western Co. | Layne Western |
| 1977 | P–91 | 125.00 | Paul Politte, Inc. | Paul Politte |
| 1977 | P–123 | 1095.00 | Sidener Supply | Larry Sidener |
| 1979 | P–221 | 1289.00 | Larry Sidener | [No endorsement] |

One of the four checks, Exhibit P–5, for $286.68, was paid by the Bank over three years before the Water District reported the manager's scheme to the Bank. That amount is not recoverable by the Water District unless the Bank was guilty of bad faith. § 4–406 U.C.C. As explained later in this opinion, this court finds as a matter of law that the Bank was not guilty of bad faith and therefore the Water District cannot recover the $268.68.

■ It may recover the amounts represented by the other three checks, however, and the judgment must be affirmed for the amount of $2,509.00. *Twellman v. Lindell Trust Co., supra.*

■ Water District also argues that, despite the literal applicability of § 3–405(1)(c), Bank may not claim its protection because Bank failed to exercise good faith in paying the checks over the forged endorsements. The obligation of good faith which § 1–203 imposes upon the performance or enforcement of every contract or duty within the U.C.C. is applicable to transactions to which § 3–405 is applicable. See *Western Cas. and Sur. Co. v. Citizens Bank of Las Cruces,* 676 F.2d at 1347.

Section 1–201(19) defines "good faith" as "honesty in fact in the conduct or transaction concerned." There is no evidence in the present case that the Bank or its employees intentionally participated in the scheme to defraud the Water District or that Bank or its employees knew of the manager's conduct. The Water District's counsel freely admitted the lack of evidence of dishonesty during the instruction conference:

> THE COURT: And we have no evidence of any inside plotting or planning or co-partnership inside the Bank for this scheme of defrauding the Water District?
>
> MR. STOLL: I agree with that. I don't know that it takes that.

Although there was no evidence of dishonesty, the record does contain evidence from which the jury could infer that the Bank failed to exercise ordinary care or observe reasonable commercial standards. A detailed discussion of the bases upon which the Bank might be found negligent is set forth below in the discussion of § 3–406, but for present purposes it is enough to say that the Bank was at least arguably negligent.

The lack of evidence of dishonesty coupled with the arguable negligence of the Bank brings this court to the crucial issue of the present case: whether a bank owes not only an obligation of honesty in fact but also a duty to exercise ordinary care or observe reasonable commercial standards when it pays an instrument over a forged endorsement under § 3–405. The issue is one of first impression in Missouri.

■ Section 3–405 itself imposes no standard of care upon a bank paying a check in a padded payroll case. The forged endorsement is made effective without regard to the paying bank's fault, thus shifting the risk of loss from the bank, which would otherwise be liable under 4–401(1), to the drawer of the check. See Official Comment 4, § 3–405 U.C.C.

In the early drafts of the U.C.C. the definition of good faith included observance of reasonable commercial standards. In later drafts the reasonable commercial standards requirement was omitted. Braucher, "The Legislative History of the Uniform Commercial Code," 58 Colum.L. Rev. 798, 812 (1958).

Section 1–201(18) of the 1950 proposed final draft defined good faith as including not only honesty in fact, but also "... observance by a person of the reasonable commercial standards of any business or trade in which he is engaged." The American Law Institute, Uniform Commercial Code Proposed Final Draft, § 1–201(18) (Text and Comments Ed. Spring 1950).

■ By 1952, however, the general definition of good faith, § 1–201(19), omitted any reference to the observance of reasonable commercial standards. The American Law Institute, Uniform Commercial Code Official Draft, § 1–201(19) (Text and Comments Ed.1952). Thus, good faith is gener-

ally limited to honesty in fact unless a specific provision of the U.C.C. imposes additional standards for a particular transaction. Braucher, 58 Colum.L.Rev. at 812; Official Comment 19, § 1–201 U.C.C.

The same progression took place in the definition of good faith as it applied to holders in due course. In the early drafts the definition included reasonable commercial standards. The American Law Institute, Uniform Commercial Code Proposed Final Draft No. 2, § 3–302(1)(b) (Text Ed. Spring 1951).

Reference to reasonable commercial standards in the definition of a holder in due course of a negotiable instrument was deleted by the Uniform Commercial Code editorial board in the 1957 official edition. The American Law Institute, Uniform Commercial Code 1957 Official Edition, § 3–302(1)(b).

Section 3–302(1)(b) of the 1956 recommendations and text reads follows: "In good faith [including observance of the reasonable commercial standards of any business in which the holder may be engaged] ... The omission of the bracketed material is intended to make clear that the doctrine of an objective standard of good faith exemplified by the case of *Gill v. Cubit,* 3B & C 466 (1824) is not intended to be incorporated in article 3." American Law Institute, Uniform Commercial Code 1956 Recommendations, p. 102–103 (1957).

The definition of good faith in the Uniform Fiduciaries Act may be examined in determining this question, which is one of first impression in Missouri. The act defines good faith as follows: "A thing is done in good faith within the meaning of sections 456.240 to 456.350 when it is in fact done honestly, whether it be done negligently or not." § 456.240.2 RSMo.1978.

■ That no duty of the bank is expressly required by § 3–405 does not mean that obligations are totally absent. Section 1–203 imposes upon all transactions under the Code the obligation to act in good faith.

The Code, however, contains no similar provision which imposes a duty to exercise ordinary care in all transactions under the U.C.C. Various provisions of the commercial paper articles, Articles 3 and 4, other than § 3–405, do impose upon the bank a negligence standard when paying instruments.

■ Section 3–406 requires a bank to exercise both good faith and "reasonable commercial standards" when paying an instrument in order to preclude one who has substantially contributed to a material alteration of the instrument from asserting that alteration against the bank. See *Twellman v. Lindell Trust Co.,* 534 S.W.2d at 91–92.

■ Also, § 4–406(3) requires a bank to exercise ordinary care before it may preclude its customer from asserting his unauthorized signature or any alteration of an item by reason of the customer's own negligence. See *Nu-Way Services, Inc. v. Mercantile Trust Co. Nat. Ass'n.,* 530 S.W.2d 743, 746–747 (Mo.App.1975).

■ The drafters of the U.C.C., and the legislatures which enacted it, were not hesitant expressly to impose upon a bank a requirement to avoid negligence where they intended that standard of care to apply. The absence in § 3–405 of a duty to act reasonably or with ordinary care frees the bank from the consequences of its own ordinary negligence when it pays an instrument over a forged endorsement in a situation covered by § 3–405. *Kraftsman Container Corp. v. United Counties Trust Co.,* 169 N.J.Super. 488, 404 A.2d 1288, 1291–1292 (1979); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chemical Bank,* 456 N.Y.S.2d 742, 746, 57 N.Y.2d 439, 442 N.E.2d 1253, 1257 (1982); *Western Cas. and Sur. Co. v. Citizens Bank of Las Cruces,* 676 F.2d at 1347–1348; *Prudential Ins. Co. of America v. Marine Nat. Exchange Bank of Milwaukee,* 371 F.Supp. 1002, 1003 (E.D.Wis.1974).

■ That the reasonable commercial standards language was eliminated from the definition of good faith and from the good faith requirement in the holder in due course section indicates that good faith

does not include the observance of reasonable commercial standards.

In addition, the legislative history of § 3–405 suggests that it was intended to shift the loss arising from padded payroll and fictitious payee cases from the drawee to the drawer. For a good discussion of this legislative history, see *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chemical Bank,* 456 N.Y.S.2d at 745–746, 442 N.E.2d at 1256–1257.

Some courts, however, have held that § 3–405 does not protect the bank where it is negligent in paying the check. In *E.F. Hutton & Co., Inc. v. City National Bank,* 149 Cal.App.3d 60, 196 Cal.Rptr. 614 (1983), the court held that § 3–405 did not apply to a negligence action where the drawer of the check sued the collecting bank on the ground that the checks had inadequate indicia of the drawer's employee's authority to cash the checks. The court reasoned that since § 1–103 states that principles of law and equity supplement the Code unless displaced by particular provisions of the U.C.C. and no Code provision displaces common law negligence recovery, § 3–405 is inapplicable to negligence actions. 196 Cal.Rptr. at 620[9].

This court is not persuaded by the California appellate court's reasoning. The more reasonable statutory interpretation is that § 3–405 does not permit recovery from a bank which pays an instrument in good faith in a padded payroll case. The court in *E.F. Hutton & Co., Inc. v. City Nat. Bank,* does not dispute the statutory interpretation, but instead allows recovery for negligence based on the common law.

To hold that one may use a common law negligence action to recover in a padded payroll case is to allow § 3–405 to become a virtual nullity. It is inconceivable that those who drafted the U.C.C. intended to forbid recovery under the Code, but to permit the same remedy for the same wrong outside the Code. Section 1–103 intended the common law to supplement, not contradict, the other provisions of the U.C.C. See also *Western Cas. &*

*Sur. Co. v. Citizens Bank of Las Cruces,* 676 F.2d at 1347–1348.

Water District cites *Underpinning & Foundation Constructors, Inc. v. Chase Manhattan Bank,* 414 N.Y.S.2d 298, 46 N.Y.2d 459, 386 N.E.2d 1319 (1979) for its contention that "a bank must apply normal commercial standards even if a check is forged and the bank may not blindly accept a check." In *Underpinning,* an employee not only obtained the check by supplying his employer with the names of payees without intending the latter to have an interest in the checks as payees, but he also forged the endorsements with stamps, which endorsements included the restriction, "for deposit only." Thus, the depository bank's failure to pay the check in accordance with the restrictive endorsement, not its mere negligence under § 3–405, is what led the court to impose liability on the bank. The New York Court of Appeals in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chemical Bank, supra,* distinguished *Underpinning* on the ground of the restrictive endorsement when it squarely held that negligence of the bank in paying a forged instrument will not result in liability for the bank if § 3–405 is applicable. 456 N.Y.S.2d at 747, 442 N.E.2d at 1258.

The Water District and the trial court relied on *General Insurance Company of America v. Commerce Bank of St. Charles,* 505 S.W.2d 454 (Mo.App.1974), which was a decision under the Uniform Fiduciaries Act, not the Uniform Commercial Code, to show that good faith was negated by "commercially unjustifiable" practices on the part of the Bank. In fact, however, the General Insurance case supports the position of the appellant Bank here.

In *General Insurance,* checks, 25 in number, cashed by a guardian were in question. They were drawn by the guardian on the guardianship account over a period of seven months. Two of them contained notations that they were for service "as per probate court's verbal order" and one for "future services."

The appellate court was faced with the question of defining good faith under the Uniform Fiduciaries Act, 456.290 RSMo. 1978 and used the "commercially unjustifiable" language which it copied from a federal court case from North Carolina, not in defining good faith, but in defining bad faith. *General Insurance, supra* at 457–458[8, 9].

The Court of Appeals in General Insurance affirmed the judgment dismissing the petition for failure to state a claim upon which relief could be granted, finding as a matter of law that no lack of good faith had been alleged. *See also, Cassel v. Mercantile Trust Company,* 393 S.W.2d 433 (Mo.1965); and *Cassel v. Security Trust Company,* 393 S.W.2d 443 (Mo.1965).

In both *Cassel* cases the supreme court also affirmed dismissals of petitions for failure to state a claim upon which relief could be granted. In those cases an executor and trustee drew 34 checks on his executor's accounts for a total of $47,500. In addition, he cashed 38 more checks, in the total amount of $62,725, at another bank which had merged with Security Trust Company.

The supreme court held that bad faith was the basis of liability and that nothing had been alleged from which bad faith could be inferred, even though the petition had alleged that the bank should have known the checks were bad because it had acted in hundreds of probate estates and that the trust department employees knew of the duties and responsibilities of executors which allegedly had been breached.

■■■ Thus, Water District may not avoid the Bank's § 3–405 affirmative defense on the grounds of Bank's failure to observe reasonable commercial standards. In addition, the evidence establishes Bank's honesty in fact. This court holds that the Bank, in fact, acted in good faith under § 1–203 and the jury should have been instructed accordingly. See *Rogers v. Thompson, supra.*

■■ Nonetheless, the Bank is not entitled to a directed verdict. The Water Dis-

trict's manager testified that he did intend the payees of the checks to have an interest in the checks and that he did not cash the checks. Incredible as the manager's testimony may be, if the jury believed it, then Bank's § 3–405 defense would be inapplicable.

## B.  SECTION 3–406 UNIFORM COMMERCIAL CODE

Bank relies heavily upon evidence of Water District's own negligence in asserting that a verdict should have been directed for Bank under § 3–406 because Water District's negligence precludes it from asserting the unauthorized signatures. Without a doubt, had Water District exercised minimal standards of internal control, such as requiring originals of invoices or an accounts payable ledger, the fraud would have been much more difficult, if not impossible, to perpetrate. Under § 3–406, however, the Bank may not ignore evidence of its own negligence.

The section reads:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

■■ Unlike § 3–405, § 3–406 requires a drawee, the Bank here, to observe "reasonable commercial standards" as a condition of taking advantage of the defense set forth in that section. The test is "... whether a reasonable man in accordance with reasonable commercial standards would be put on notice of some impropriety appearing either from the form of the instrument and its endorsements, or from knowledge of facts outside the instrument itself." *Trust Co. of Georgia Bank of Savannah v. Port Terminal & Warehousing Co.,* 153 Ga.App. 735, 266 S.E.2d 254, 258 (1980).

The jury could have found from the evidence that Bank failed to follow reasonable commercial practices. Water District alleges numerous grounds upon which Bank could be found negligent; at least two of the Water District's allegations would support a finding of the Bank's failure to observe reasonable commercial standards. The other asserted bases of negligence will not be discussed due to the length of this opinion.

First, Bank could have been found by the jury not to have exercised reasonable commercial standards in accepting for payment checks made payable to companies and corporations, such as Pitney Bowes, where the payees' endorsements were handwritten rather than stamped. A handwritten endorsement of a corporation or business entity should give reasonable people in the banking business a suspicion that the endorsement may be forged.

Second, the jury could have found Bank negligent for not requiring the person presenting the checks to endorse the checks. If the manager of Water District, or whatever person cashed the checks, had been required to endorse the checks, an audit trail would have been created by which Water District could have determined who was cashing the checks and by this means investigated the fraud which was perpetrated on it.

The Bank correctly points out that § 3–505 merely makes the presentor's signature optional with the bank and under § 3–204(2) a check endorsed in blank becomes bearer paper; however, nothing in the Uniform Commercial Code states that a bank as a matter of law practices reasonable commercial standards by not requiring the presentor's endorsement.

The evidence presented an issue to the jury as to whether Bank exercised the reasonable commercial standards required by the § 3–406 defense. The Bank was, therefore, not entitled to a directed verdict because of the Water District's negligence under § 3–406.

## C. SECTIONS 3–417, 4–207 UNIFORM COMMERCIAL CODE

The Bank argues that a directed verdict should be granted because the Water District's manager had apparent and inherent authority to cash the checks on behalf of the Water District so that the district warranted that it had good title or was authorized to obtain payment on behalf of one who had good title under §§ 3–417 and 4–207, the statutes which set forth the warranties on presentment and transfer of promissory notes and checks. The argument has no merit.

If, as the Bank theorizes, a faithless employee of the Water District took the checks after inducing their issuance and then forged the payees' endorsements, then the Water District has no liability under either § 3–417 or § 4–207. Sections 3–417(1), (2), and 4–207(1), (2) do not apply to the Water District because it neither obtained payment or acceptance of, nor received consideration or a settlement for the checks.

The Water District did not breach its warranty of title § 4–207(1)(a). There was no unauthorized signature of the drawer. § 4–207(1)(b). There was no material alteration. § 4–207(1)(c).

The only way the Water District would be liable for breach of warranty is if it re-entered the chains of title at some point after the forgeries and then transferred the checks for consideration. This did not happen. This point is not well taken.

## II. JURY INSTRUCTIONS

The Bank also argues that the trial court committed several errors in instructing the jury.

### A. DEFINITION OF GOOD FAITH

The Bank first argues that the trial court erred in its definition of good faith. The point is moot because upon remand, no jury instruction will hypothesize a finding of good faith. No definition of good faith will be necessary unless evidence of dishonesty in fact is adduced at retrial.

## B. AFFIRMATIVE DEFENSE OF § 3–405

Instruction No. 9 was also erroneous because Instruction 9 required the jury to find that "the Bank paid the checks *in good faith and in accordance with the reasonable commercial standards of its business.*" This is appellant's third point. The complete instruction read:

### INSTRUCTION NO. 9

Your verdict must be for defendant if you believe:

First, some person or persons who worked for the Water District supplied the names of the payees of the checks which later had the forged endorsements, and

Second, that person or those persons intended the payees to have no interest in the checks, but intended that they should be cashed with forged endorsements by somebody else, and

Third, that the Bank paid the checks in good faith and in accordance with the reasonable commercial standards of its business.

The Bank offered Instruction No. A which was the same instruction except that the third paragraph was omitted.

The instruction is erroneous for two reasons. First, Bank is not required to pay checks "in accordance with the reasonable commercial standards of its business" under § 3–405. See discussion in I.A., *supra.* Thus, an instruction on § 3–405 should omit any reference to reasonable commercial standards.

Second, all the evidence and the Water District's counsel's admission points to a finding of good faith and thus the jury should not have been instructed on good faith. See page 853, *supra.* Accordingly, Bank's Instruction A was the proper submission of § 3–405.

Respondent relies on *Kraftsman Container Corporation v. United Counties Trust Co., supra;* and *Underpinning and Foundation Constructors, Inc. v. Chase Manhattan Bank, supra.*

The *Underpinning* case is distinguishable from the case under review because there checks were deposited with a restrictive endorsement: "For Deposit Only." The New York Court of Appeals held that the depository bank, (not the drawee bank), could be successfully sued by the drawer of the checks because of the bank's failure to give effect to the restrictive endorsement. *Merrill Lynch, Pierce, Fenner & Smith, supra,* distinguishes the *Underpinning* case.

*Kraftsman Container Corporation, supra,* also does not help respondent. The New Jersey court failed to apply the reasonable care negligence standard to the bank in a fictitious payee endorsement case, calling it a novel proposition, 404 A.2d at 1290. The court did not sustain the novel proposition and applied as its standard of good faith the standard of honesty in fact. *See Brighton, Inc. v. Colonial First National Bank,* 176 N.J.Super. 101, 422 A.2d 433 (1980).

## C. SECTION 4–406(4) UNIFORM COMMERCIAL CODE

In appellant's fourth point it alleges error in the determination of the three year limit on reporting unauthorized endorsements under § 4–406(4) which reads:

Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subsection (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized endorsement is precluded from asserting against the bank such unauthorized signature or endorsement or such alteration.

On January 25, 1980, employees of the U.S. Department of Agriculture, who were auditing the Water District's financial condition pursuant to a Water District loan application, met with officers from the

Bank. The team from the Department of Agriculture told bank officers of their suspicions regarding the forgeries and informed the Bank of the number of checks, the amounts involved, the time period of the investigation (January, 1975 through 1979), and the names of several payees. The bank officers also looked at several of the checks, which were in the custody of the Department of Agriculture. The facts concerning the meeting were stipulated to by the parties. The next report which the Bank received was the Water District's suit which was filed on February 11, 1981.

The issue is whether the discovery and report requirement of § 4–406(4) may be satisfied by one who is unrelated to the customer. The Department of Agriculture was not acting as an agent of the Water District, although in a sense the Department of Agriculture employees were acting on behalf of the Water District in auditing the Water District's books to determine its eligibility for a loan.

▇▇▇ The purpose of the statute is to set an absolute time limit of three years on the discovery of a forged endorsement by the customer. Official Comment 5 to § 4–406. There is also the obvious purpose of giving a bank notice of the questioned checks. The customer cannot recover for any checks cashed prior to the three year period. The Bank's liability is thus limited.

Research disclosed no Missouri cases, and only one from another state, which speak to the question of the adequacy of a report to a drawee bank as required by § 4–406(4). The Water District cites *American Home Assurance Company v. Scarsdale National Bank & Trust Company*, 96 Misc.2d 715, 409 N.Y.S.2d 608 (1978). This is a county court case which carries no authority as precedent in Missouri, but it illustrates how one court viewed the problem of notice in one situation.

In the New York case there was only a discussion and exchange of letters between the customer and the bank concerning unexplained overdrafts and forgeries, no formal report. The bank defense contend-

ed the discussions and letters did not constitute a report as a matter of law. The court, in denying a summary judgment, held that whether the customer gave the required report to the bank was a question of fact.

The trial court here ruled that the question of the report and notice was a matter of law. The trial court found the notice by the Department of Agriculture employees to the Bank to be sufficient under the Code and instructed the jury in accordance with that finding. This court agrees.

The disclosures by the Department of Agriculture employees to the Bank—number of checks involved, time period, suspicion of forgery, and the names of payees—gave the Bank as much information as a report from the Water District would have.

The Bank officers saw several of the questioned checks and knew that the Water District had learned of the, at that time, purported, defalcations. The purpose of the statutory report requirement was met. The Bank's liability is limited by the earlier date, January 25, 1980, rather than February 11, 1981 when the Water District filed suit.

▇▇▇ Taken literally, the statute requires the customer, here the Water District, to make the reports, but the facts disclosed by the Department of Agriculture employees who were performing an audit for the Water District were sufficient to satisfy the statutory requirement in this case.

▇▇▇ Although the trial court correctly ruled that the discovery and report requirement was fulfilled on January 25, 1980, it should not have instructed the jury on the issue. The trial court's instruction read: "As to the checks cashed before the 1st day of January, 1977, your verdict must be for the defendant if you believe defendant paid the checks in good faith." Because the jury should not have decided the issue of good faith in the present case, page 852 *supra*, there was no issue for them to resolve in connection with § 4–406. The

trial court should have directed a verdict for Bank as to all checks cashed before January 1, 1977.

### D. SECTION 3–406 UNIFORM COMMERCIAL CODE

In appellant's fifth point it contends that trial court erred in refusing to withdraw from the jury's consideration evidence of the Bank's failure to obtain endorsements from the person or persons who cashed the checks. Appellant also complains about the trial court's failure to sustain objections to the Water District's closing argument about the failure to obtain endorsements. This point is not well taken.

 Upon remand, if the court or jury finds that § 3–405 is not applicable, the question of the observance by the Bank of reasonable commercial standards may be at issue under § 3–406. Arguably, the failure to obtain endorsements from a person who receives large amounts of cash is a failure to observe reasonable commercial standards. See page 853, *supra*.

### E. NEGLIGENCE OF THE WATER DISTRICT

In its sixth point appellant complains that the trial court erred in refusing to give either its Instruction No. E or Instruction No. I relating to the negligence of the Water District. In those instructions, one of which dealt with the checks severally, and the other of which dealt with them as a group, appellant used the term "ordinary care" and its definition. The offered instructions directed a verdict for the defendant if the Water District could have prevented, or detected and stopped, the forgeries by the use of ordinary care.

The trial court gave Instruction No. 8 directing a verdict for the defendant if it found that the plaintiff was negligent and such negligence substantially contributed to the making of the forged endorsements.

Section 3–406 of the statute uses the word "negligence" and this court finds no error in failing to give Instruction No. E or I or in the giving Instruction No. 8.

### III. CONCLUSION

The Water District throughout the trial relied very heavily on the instructions relating to reasonable commercial standards and the commercially unjustifiable language in Instruction No. 4. Negligence is not bad faith. Good faith, as it directs in the statute, is honesty in fact. Failure to observe reasonable commercial standards does not negate good faith, although it may be negligence. The case was not tried on the correct principles of law and for that reason must be remanded for a new trial except for the checks on which the endorsements differed from the payees named on the faces of the checks.

The judgment for the plaintiff is affirmed in the amount of $2,509. In all other respects it is reversed and remanded.

SMITH, P.J., and SATZ, J., concur.