673 P.2d 938

**FIRST NATIONAL BANK OF ARIZO-NA, a national banking association, Plaintiff-Appellee,**

v.

**CONTINENTAL BANK, an Arizona corporation, Defendant-Appellant.**

No. 1 CA–CIV 5966.

Court of Appeals of Arizona, Division 1, Department A.

Sept. 20, 1983.

Review Denied Nov. 15, 1983.

Streich, Lang, Weeks & Cardon by William S. Hawgood II, Barbara Richmond Berman, Phoenix, for plaintiff-appellee.

Filler, Paytas, Shannon & Fleming and Earl Terman by Henry R. Paytas, Scottsdale, for defendant-appellant.

## OPINION

CONTRERAS, Acting Presiding Judge.

Three issues are presented in this appeal from the granting of a summary judgment in a case regarding the rights of a payor bank against the collecting bank for an item paid on unauthorized endorsements:

(1) Whether a payor bank can revoke payment of a check to a collecting bank based upon a stop payment order received from its customer four months after the check was paid when it is subsequently discovered that at the time payment was made the check contained unauthorized endorsements.

(2) Whether the collecting bank's supplying of proper endorsements in place of unauthorized endorsements constitutes a ratification sufficient to remedy the col-

lecting bank's previous breach of presentment warranties.

(3) Whether the award of attorney's fees by the trial court was proper.

We believe the trial court correctly resolved the substantive issues in favor of the collecting bank and that its award of attorney's fees was proper. We affirm the judgment.

THE UNDISPUTED MATERIAL FACTS

The material facts are not in dispute. Joseph Construction Co. (Joseph) maintained a checking account with the appellant Continental Bank (Continental). Joseph issued a check jointly payable to its subcontractor, R & S Enterprises (R & S), and three of R & S' materialmen, Central Distributing Division (Central), The Harlan Company (Harlan), and Amfac Electric Supply Co. (Amfac). R & S endorsed the item for itself, and, without authorization, typed in endorsements for the other three payees. The check was deposited on or about April 20, 1978, with appellee First National Bank (First National), was forwarded by First National through the Phoenix Clearing House, and First National received provisional credit for the item.

Nothing further occurred until August 9, 1978, when Joseph, the drawer notified Continental that the endorsements of the three materialmen payees were unauthorized. Continental sent the check back to First National, along with Central's affidavit of forgery,[1] through the Phoenix Clearing House as an "entry" item, receiving credit for the item to its Clearing House account. Continental recredited Joseph's account for the amount of the item and permitted withdrawals based on the recrediting.

First National then obtained a written ratification of the challenged endorsement from Central and returned the check to

---

1. Continental has referred to the typed endorsements as "forgeries." However, the trial court did not have to decide whether the typed endorsements were "forgeries" in the criminal genre or endorsements without express or implied authority. The U.C.C. uses the term "un-

authorized signature" to embrace both situations thereby making any distinction between the two irrelevant for purposes of this case. *See* A.R.S. §§ 44-2208(43) (U.C.C. § 1-201(43)), 44-2541 (U.C.C. § 3-404). ·

Continental. Continental refused to recredit First National's account and returned the items with an affidavit of forged endorsement by Amfac. First National then obtained written ratifications of the endorsements from Amfac and Harlan and returned the item on September 8, 1978, to Continental. Before the item was returned to Continental, Joseph had issued a stop-payment order which Continental received on September 6, 1978. On September 12, 1978, Continental again returned the check to First National because of the stop payment order and refused to recredit First National's account with the Phoenix Clearing House.

First National filed a complaint on March 29, 1979, to recover the amount of the item, plus attorney's fees, costs, and interest. The parties filed cross-motions for summary judgment. The court granted First National's motion, denied Continental's, and entered a formal judgment. Continental timely appealed from the judgment.

## EFFECT OF STOP PAYMENT ORDER ON PREVIOUS PAYMENT

The first issue presented is whether the drawer's stop payment order was effective despite previous payment by Continental. Continental argues that by transferring a check to it with a forged endorsement, First National violated its presentment warranty, so that payment was not final under A.R.S. § 44–2626 (U.C.C. § 4–303), and left intact Joseph's right to stop payment. Although the issue presents a close question with no authority precisely on point, we disagree with appellant's analysis.

The drawer's right to stop payment derives from A.R.S. § 44–2629 (U.C.C. § 4–403) which provides that the bank may disregard the stop payment order unless the order, "is received by the bank in such time and in such manner as to afford the bank a reasonable opportunity to act on it prior to the happening of any of the events described in § 44–2626." In this regard A.R.S. § 44–2626(A) (U.C.C. § 4–303(1)) provides that:

A. *Any* knowledge, notice or *stop-order received by*, legal process served upon or setoff exercised by *a payor bank*, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item or to charge its customer's account for the item, *comes too late to so terminate, suspend or modify* such *right or duty if the* knowledge, notice, *stop-order* or legal process *is received* or served *and a reasonable time for the bank to act thereon expires* or the setoff is exercised *after the bank has done any of the following:*

 1. Accepted or certified the item;

 2. Paid the item in cash;

 3. Settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement;

 4. Completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item; or

 5. *Become accountable for the amount of the item under paragraph 4, subsection A of § 44–2622* and *§ 44–2625* dealing with the payor bank's responsibility for late return of items. (emphasis supplied).

A.R.S. § 44–2622 (U.C.C. § 4–213) provides in relevant part:

(A) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

 . . . . . .

 4. Made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.

The Uniform Commercial Code has thus established a scheme "to determine what might be termed the winner of a race ... for the amount of the item." *H. Bailey, Brady on Bank Checks,* § 14.22 at 14–59 (5th ed. 1979). In this case, the "race" is between final payment and the stop payment order.

The first matter then is to determine whether there was a final payment under A.R.S. § 44–2626. It is clear that the item was provisionally credited to First National, on April 20, 1978, which settlement was not revoked by Continental within the Code's midnight deadline, A.R.S. § 44–2604(A)(8) (U.C.C. 4–104(1)(h)), or the deadline established by the rules of the Phoenix Clearing House Association.

First National argues that because Continental did not timely revoke the provisional settlement, the payment became final. Its argument continues that because, pursuant to A.R.S. § 44–2629(A),[2] the customer's right to stop payment ends upon the happening of any of the events described in § 44–2624 (U.C.C. § 4–301), including failure to timely revoke provisional settlement, Joseph Construction Co. had no right to stop payment at the time it attempted to do so, and that Continental erred in giving effect to the stop payment request.

 Continental argues, however, that a check paid on a forged endorsement is an exception to the final payment scheme set forth in A.R.S. § 44–2626 (U.C.C. § 4–303), and therefore the customer retains the right to stop payment where his check has been paid on a forged endorsement. We believe that there is an exception only to the extent that the final payment rule does not bar the payor bank from seeking a recovery against the depository bank for breach of presentment warranties. *See* A.R.S. § 44–2616 (U.C.C. § 4–207). We do not believe, however, that the payor bank's presentment warranty rights undo or preclude the final payment made by Continental under § 44–2626 (U.C.C. § 4–303). To adopt appellant's argument would be to introduce a great amount of uncertainty to the finality of payment rule in any case where the endorsements are questioned.

The case most closely on point is *Maddox v. First Westroads Bank*, 199 Neb. 81, 256 N.W.2d 647 (1977). In that case, a check was paid on a forged endorsement. The customers sued their bank, the payor bank, for improperly charging their accounts, and the collecting bank for paying on the forged endorsement. The collecting bank, answering a cross-claim filed by the payor bank, argued that the U.C.C. finality of payment rules precluded the payor bank's claim for breach of presentment warranty under U.C.C. § 4–207. The court disagreed:

 This contention is clearly erroneous. Sections 3–418 and 4–213, U.C.C., establish when payment on a negotiable instrument or check becomes final in favor of a holder in due course, but Center Bank in this case is not a holder in due course. A bank is not a holder as defined in section 1–201, U.C.C., and therefore not a holder in due course as defined under section 3–302, U.C.C., when it receives a check bearing a forged endorsement. *See, Tubin v. Rabin*, 533 F.2d 255 (5th Cir., 1976); *Riggs Nat. Bank of Washington D.C. v. Security Bank N.A.*, 10 U.C.C.Rptr.Serv. 460 (D.C.Super., 1972); *Salsman v. National Community Bank of Rutherford*, 102 N.J.Super. 482, 246 A.2d 162 (1968), affirmed, 105 N.J.Super. 164, 251 A.2d 460; Brady on Bank Checks, § 5.1, p. 87. *When a collecting bank receives a check bearing a forged endorsement and processes it through banking channels, the warranties set forth in section 4–207, U.C.C., apply, and the fact that the drawee bank has paid the check does not bar it from recovery under the warranties of the collecting bank on the ground that final payment had been made.* White & Summers, Uniform Commercial Code, § 16–1, p. 519 (1972). (Emphasis supplied.)

256 N.W.2d at 654. We do not believe that the Nebraska Supreme Court was saying

---

**2.** A. A customer, or any customer if there is more than one, or any person authorized to sign checks or make withdrawals thereon may stop payment of any item payable for or drawn against such customer's or customers' account but the bank may disregard the same unless the order is in writing, is signed by such customer or authorized person, describes with certainty the item on which payment is to be stopped, and is received by the bank in such time and in such manner as to afford the bank a reasonable opportunity to act on it prior to the happening of any of the events described in § 44–2626.

that the forged endorsement meant that payment was not final but only that the final payment rule does not ban the payor bank's suit for breach of presentment warranties under U.C.C. § 4–207. *See Brady on Bank Checks, supra,* § 23.22 at 23–51.

In *Security Trust & Savings Bank v. Federal Reserve Bank of Minneapolis,* 269 F.Supp. 893 (D.Mont.1967), the payor bank mistakenly paid an item despite insufficient funds and a missing endorsement. Upon discovering these oversights, the payor bank returned the item to the collecting bank for both of the above reasons. The collecting bank obtained the missing endorsement and returned the item to the payor bank. The payor bank thereafter returned the item because of insufficient funds. The court held that the payor bank could not use the missing endorsement to return an item and then refuse payment on the insufficient funds ground when the item was returned to it by the collecting bank with the missing endorsement supplied.

■ We believe that *Security Trust & Savings* indicates that Continental Bank erred in treating the item as though final payment had not been made and returning the check as an entry item (causing a credit to it) rather than as a non-entry item (causing a credit only if agreed to by First National Bank).[3] As stated by the court:

> The rules heretofore noted contemplate that an item be returned the next day for credit and if it is returned later that it be returned without entry; that is, as an item which changes the account of neither the drawee bank or the Federal Reserve System. The check here was sent as a cash item. Plaintiff [payor bank] was advised that the Federal Reserve Bank would, without checking the time, credit its account. Had the plaintiff followed the rules it would not have received credit for the returned item on the defendant's [collecting bank] books on July 19 or 20. Had the plaintiff returned the check as a non-entry item the defendant would have sent it up the line and made a refund to the plaintiff only if the sending bank had authorized it to do so. When on November 4, 1963, defendant finally charged plaintiff's account with the amount of the check it was only recouping the money which should never have left the defendant's account, and would not have left the defendant's account except for the plaintiff's representation (by the inclusion of the check in the cash letter) that the check was returned within the time provided by Regulation J. The rights are as though the credit had not been given to plaintiff and the money at all times retained in the defendant's account.

269 F.Supp. at 896.

Our decision is also supported by *Citizens & Southern National Bank v. Youngblood,* 135 Ga.App. 638, 219 S.E.2d 172 (1975). There the payor bank sued the payee for unjust enrichment. The drawer's check to the payee was used by the payee to obtain a cashier's check from the payor bank. The next day, the drawer issued a stop payment on his check. The payor bank then demanded that the payee return the cashier's check. The court held that the payor bank erred by not immediately debiting the drawer's account when the payee obtained the cashier's check. Further, the court held, because the cashier's check was the equivalent of payment in cash, final payment had been made, and the payor bank again erred in not telling the drawer that the stop payment was too late and ineffective. Although *Youngblood* is not a forged endorsement case, we believe it illustrates the relationship between the final payment rule and the right to stop payment, and the benefits of certainty in that relationship. *See also Georgia Railroad Bank & Trust Co. v. First National Bank & Trust Co. of Augusta,* 139 Ga.App. 683, 229 S.E.2d 482 (1976).

---

**3.** Although *Security Trust & Savings* was decided under the regulations of the Federal Reserve System rather than the Uniform Commercial Code, we think the reasoning therein is applicable to the Code because of the similarity of provisions regarding return of items in the two systems.

■ Appellant argues that if it had not stopped payment, it would have lost the amount paid and been liable to its customer for the amount paid on the forged endorse-. ment, based on *Trust Co. of Georgia v. Student Air Travel Agency, Inc.*, 142 Ga. App. 248, 235 S.E.2d 670 (1977). The argument is incorrect. For one thing, that case deals only with the relations between the payor bank and its customer. There is no indication that the payor bank did not have a claim for breach of presentment warranties against the collecting bank, which would have remedied any "double payment" problem. Secondly, we note that where the payor bank makes an improper payment to the payees, it is subrogated to the rights of the payees against the drawer. *See* Comment 2 to U.C.C. § 4–407. The drawer is not entitled to a double benefit of having his debt to the payee(s) paid off while retaining the funds in his account.

■ In conclusion on this issue we are of the opinion that Continental Bank erred in stopping payment on the check because final payment had already been made, and Continental should have informed its customer that the stop payment order was too late and that it would not recredit Joseph's account.

### EFFECT OF SUPPLYING PROPER ENDORSEMENTS

■ The resolution of the preceding issue does not end our analysis, for if there was indeed a breach of presentment warranties under A.R.S. § 44–2616 (U.C.C. § 4–207), First National's claim would be defeated by an offsetting counterclaim based on its own breach. It is clear that there was initially a breach, because the parties have stipulated that the original endorsements of the materialmen payees were forged in the sense that they were unauthorized. The question is whether the subsequent ratification of unauthorized endorsements by these payees was a ratification such as to cure breach of presentment warranties.

A.R.S. § 44–2541 (U.C.C. § 3–404) provides in relevant part:

A. Any unauthorized signature is wholly inoperative as that of the person whose name is signed *unless he ratifies it* . . .
B. *Any unauthorized signature may be ratified for all purposes of this article* . . .

Official Comment 3 to° U.C.C. § 3–404 states in relevant part:

A forged signature may at least be adopted; and the word "ratified" is used in order to make it clear that the adoption is retroactive.

It appears from the comment that the purpose of the ratification provision is to sanction the result where a payee's signature is unauthorized, but he is in fact paid or for other reasons, has no complaint with the result. Obviously, the supplying of proper endorsements by the materialmen payees here shows the ratification of the unauthorized endorsements. They necessarily were paid or were otherwise satisfied. The drawer has had its obligation to its materialmen payees satisfied. *See Security Trust & Savings, supra*, at 896. Therefore, the ratification is sufficient to cure the First National's previous breach of presentment warranties.

### PROPRIETY OF AWARD OF ATTORNEY'S FEES

The last issue presented is whether the award of attorney's fees to First National was proper. Appellant's argument has three sub-arguments: (1) A.R.S. § 12–341.-01 is only meant to mitigate the burden of litigation for persons who could not otherwise afford litigation; (2) that even if fees are awardable to First National, no fees should be awarded for hours expended before the filing of the complaint and (3) the fees awarded by the trial court are excessive. We address these arguments in turn.

■ First, appellant cites no authority for its proposition that A.R.S. § 12–341.01 is only meant to allow fees to those who could not otherwise afford to litigate. The statute itself indicates no such purpose. The purpose as stated in the statute itself is "to mitigate the burden of the expense of

**200**

litigation to establish a just claim or a just defense." *Shirley v. Hartford Acc. & Indem. Co.,* 125 Ariz. 70, 607 P.2d 389 (App. 1979). Courts will not read into a statute something which is not within the manifest intention of the legislature as indicated by the statute itself. *E.g., City of Phoenix v. Donofrio,* 99 Ariz. 130, 407 P.2d 91 (1965).

█ Similarly, appellant does not cite any authority for the proposition that any legal fees incurred prior to the filing of the complaint are not recoverable under A.R.S. § 12–341.01. Appellant's argument is that there is no litigation until the complaint is filed. We think the better view is that pre-complaint investigation and evaluation of the potential claim is part of the process and expense of litigation. As the appellee states, a contrary decision would encourage the filing of complaints with little or no investigation or evaluation as to the validity of the claim.

█ Lastly, we reject appellant's argument that the fees awarded were excessive. First, we note that appellee requested $6,062.45 in its application for attorney's fees in the Superior Court. The court reduced the amount awarded as attorney's fees in the judgment to $4,995.45. While even this lesser amount might appear excessive on its face in a case decided upon a motion for summary judgment, the case involves complex and novel issues under the Uniform Commercial Code. Under these circumstances, we cannot say that the trial court abused its discretion in the amount of attorney's fees it awarded. For the foregoing reasons, the judgment is affirmed.

KLEINSCHMIDT, P.J., and YALE McFATE, Judge (Retired), concur.

NOTE: The Honorable Yale McFate was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. VI, § 20.