712 P.2d 966

**CITY OF PHOENIX, a municipal corporation,**
**Plaintiff-Appellant/Cross-Appellee,**

v.

**GREAT WESTERN BANK & TRUST,**
**an Arizona corporation,**
**Defendant-Appellee/Cross-Appellant.**

**No. 1CA–CIV7067.**

Court of Appeals of Arizona,
Division 1, Department A.

Nov. 5, 1985.

Jennings, Strouss & Salmon by William T. Birmingham, M. Byron Lewis, Phoenix, for City of Phoenix.

Reed, Goldstein & Jenkins-Reed, P.C. by Kenneth R. Reed, David B. Goldstein, Robin A. Morris, Phoenix, for Great Western Bank.

## OPINION

CORCORAN, Judge.

Appellant City of Phoenix (City) appeals from the grant of summary judgment in favor of appellee Great Western Bank & Trust (Bank). The primary issue on appeal is whether the alleged misconduct of a depositary bank which accepts a fraudulently issued warrant precludes application of the "fictitious payee rule." We affirm the summary judgment in favor of the Bank. The Bank cross-appeals the denial of its request for attorney's fees. We reverse and remand for the trial court to consider the motion for attorney's fees.

### 1. Background

*Opening of the Checking Account at the Bank.* On July 31, 1980, Gary Hann opened a non-interest bearing checking account at the Bank's downtown Tucson branch in the name of Duncan Industries with a cash deposit of $200. Hann told the Bank that Duncan Industries was a sole proprietorship "involved in investments." Hann listed the mailing address of the business as a post office box and designated himself as the authorized signer on the account. Hann also provided the Bank with a taxpayer identification number for the business, his personal social security number, a local telephone number, a local business address, Hann's Arizona driver's license number, and Hann's University Hospital patient card. The Bank's operation manual requires that new customers present two approved forms of identification; Hann only presented one form of identification specified on the list. The Bank did not require identification documents for the business nor did they verify the information given by Hann. The signature card for the account was reviewed by the branch manager before it was filed.

*Preparation of the Fraudulent Warrant.* Earlier in 1980, Jay R. Maisel was employed by the City under a government-funded program to assist ex-convicts. Maisel had recently served nine years in prison for theft and other offenses. The City was aware of Maisel's background. He was initially placed in a non-sensitive position but five months later was promoted to a position in which he was responsible for preparing necessary documentation to pay the City's vendors. Six months after his promotion, Maisel prepared two claims packages for one vendor, Duncan Industries, causing the City to issue duplicate warrants to the order of Duncan Industries, each being in the amount of $514,320.40. The legitimate warrant was mailed to the vendor in Chicago; the fraudulent warrant was mailed to Maisel's confederate, Hann, in Tucson.

*Passing of the City's Warrant.* When Hann presented the fraudulent warrant for deposit in the Tucson Bank branch four days after his account was opened, the teller requested deposit authorization from the operations officer for the branch. The operations officer examined the warrant and the signature card to verify the address and endorsement. The deposit was accepted with a four-day hold to prevent withdrawals prior to payment by the drawee bank. The warrant was honored by the drawee Valley National Bank in Phoenix the next day.

*Withdrawals from the Bank.* Four days after the warrant was deposited, Hann began making withdrawals from the account. On the first day following the hold period, Hann withdrew approximately $20,000. For the next two weeks he withdrew amounts ranging from $4,900 to more than $100,000 on each subsequent banking day. Within ten days, Hann withdrew over $441,000 from the account. Many of the withdrawals were for cashier checks made payable to coin and stamp or diamond and bullion dealers.

*Summary Judgment.* The parties' cross-motions for summary judgment were each supported by an affidavit of a banking expert setting forth their analysis of the events surrounding the opening of the account, the passing of the warrant, and the withdrawal transactions. The City proceeded in its own behalf and as assignee of the rights of the drawee Valley National Bank. The Bank's expert concluded that Great Western's actions complied with rea-

sonable commercial banking standards. The City's expert concluded that the Bank's actions amounted to gross violations of reasonable banking standards, willful ignorance and intentional and reckless disregard of suspicious circumstances, and "bad faith." The trial court granted summary judgment in favor of the Bank without specifying its reasons. The apparent basis of the summary judgment was a determination that there were no material questions of fact as to the good faith of the Bank, or that A.R.S. § 47–3405 relieved it from liability as a matter of law.

## 2. Fictitious Payee Rule

A.R.S. § 47–3405 [1] provides an exception to the general rule (§ 47–4401) that forged endorsements are ineffective to pass title or to authorize a drawee to pay. Under § 47–4401, a drawer can usually require the drawee bank to recredit the drawer account when the drawee pays a check on which a necessary endorsement is forged. The drawee bank can then shift the loss to previous endorsers on the ground of breach of warranty. A.R.S. §§ 47–3417 and 47–4207. The loss under the general rule will ultimately rest with the person who forged the instrument or the bank who took the instrument from the forger.

Section 47–3405(A)(3), often referred to as the "fictitious payee rule," [2] provides in pertinent part:

A. An indorsement by any person in the name of a named payee is *effective* if:

. . . .

3. An agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest.

(Emphasis added.)

 The exception places the loss from the activities of a faithless employee upon the employer rather than upon the drawee bank. The loss is shifted by making the endorsement "effective" although it is unauthorized. *Continental Bank v. Wa-Ho Truck Brokerage*, 122 Ariz. 414, 595 P.2d 206 (App.1979). Since the endorsement is "effective" the "instrument passes as though there had been no forgery and as between a collecting bank and the drawer of the check, the loss must fall on the drawer employer." *Id.* at 421, 595 P.2d at 213. The rule, as applied, also eliminates any liability of a collecting bank for breach of warranty of the genuineness of the signatures, §§ 47–3417 and 47–4207, because a signature that is "effective" is to be regarded as "genuine" for the purpose of warranty liability. Thus, in this case, the City, as assignee of drawee Valley National Bank, has no recourse against the Great Western Bank based on the warranties contained in §§ 47–3417 and 47–4207 owed by the Bank to the drawee Valley National Bank. *See Fidelity & Cas. Co. v. First City Bank*, 675 S.W.2d 316, 318 (Tex. App.1984); H. Bailey, *Brady on Bank Checks* § 25.17 (5th ed. Supp. No. 2 1985).

The basis of the fictitious payee rule is explained in UCC § 3–405, Official Comment 4:

The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insur-

---

**1.** This opinion cites to the Arizona Revised Statutes version of the Uniform Commercial Code (UCC) sections as amended and transferred from Title 44 by Laws 1984, Ch. 77 § 29, effective August 3, 1984. The amendment tracks the A.R.S. and UCC as follows: A.R.S. § 47–3405; UCC § 3–405.

**2.** This case involves a variation of the "padded payroll" scheme. *See* B. Clark, *The Law of*

*Bank Deposits, Collections and Credit Cards*, paragraph 6.4[7][c][iii] (rev. ed. Supp. No. 2 1985); Note, *U.C.C. Section 3–405: Of Impostors, Fictitious Payees, and Padded Payrolls*, 47 Fordham L.Rev. 1083, 1101 (1979); *Merrill Lynch, Pierce, Fenner & Smith v. Chemical Bank*, 57 N.Y.2d 439, 456 N.Y.S.2d 742, 442 N.E.2d 1253 (1982).

ance is properly an expense of his business rather than of the business of the holder or drawee.

The factual circumstances for application of § 47–3405(A)(3) are met in this case. Maisel, an "employee" of the drawer, the City of Phoenix, supplied the City, as to the duplicate warrant, with the name of a "payee," Duncan Industries, with the intent of creating no interest in Duncan Industries.

The Bank claims that it is shielded from liability by the terms of § 47–3405. The City responds that the Bank's failure to exercise reasonable care in opening the Hann account, accepting the warrant for deposit and allowing Hann to withdraw almost the entire amount of the check in ten days estops the Bank from asserting the fictitious payee rule as a defense. The issue of whether negligence of a bank estops the bank from asserting § 47–3405 as a defense is a novel issue for this court.

A literal reading of § 47–3405 and the associated comment suggests that the rule may be asserted as an absolute defense regardless of the *payor's* conduct. *See, e.g., Braswell Motor Freight Lines v. Bank of Salt Lake,* 28 Utah 2d 347, 350, 502 P.2d 560, 562 (1972) ("any loss arising from such transaction must fall upon the drawer who employed the dishonest signing agent"). Section 47–3405 does not explicitly set forth the standard which a bank must meet in order to shift liability to the drawer. This is in contrast to an associated section, 47–3406, which specifically precludes a drawer from asserting an unauthorized signature if the bank acts "in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." Similarly, § 47–4406(C), which establishes the customer's duty to discover and report fraudulent checks in the current statement, "does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item or items."

■ The lack of an explicit standard of care in § 47–3405 has created confusion as to the standard for liability for a fictitious

payee loss. In our view the fictitious payee rule is not intended to provide an absolute defense. Although there is no good faith requirement specifically set forth in § 47–3405, banks are obligated to act in "good faith" in all contracts and duties by § 47–1203. Thus, to successfully assert the effectiveness of an endorsement under § 47–3405(A)(3) a bank must have acted in good faith. *Prudential Ins. Co. v. Marine Nat'l Exch. Bank,* 371 F.Supp. 1002, 1003 (E.D.Wis.1974) ("to the extent that a cashing bank is subject to the 'good faith' requirement ... its defense under § 403.405(1)(c) [3–405(1)(c)] is, of course, not absolute"); *Fair Park Nat'l Bank v. Southwestern Inv. Co.,* 541 S.W.2d 266, 270–71 (Tex.App.1976) ("the drawer cannot avoid the defense provided in § 3.405 [§ 3–405] without a showing of bad faith").

■ The "good faith" requirement of § 47–1203 is defined in § 47–1201(19) as "honesty in fact in the conduct or transaction concerned." This is generally interpreted as a subjective test of honest. *Farmers Coop. Elevator, Inc. v. State Bank,* 236 N.W.2d 674 (Iowa 1975). It is a test of whether the bank had actual knowledge of dishonesty—sometimes referred to as the "white heart and empty head" standard. J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* § 6–3 at 218 (2d ed. 1980). It is clear that a bank must observe a good faith standard in order to invoke the protection of § 47–3405. It is, however, unclear whether banks must also be free of negligence as a prerequisite to invoking the rule. We hold that negligence is irrelevant to a § 47–3405 defense asserted by a depositary bank. Superimposing a negligence standard on the "good faith" requirement of §§ 47–1203 and 47–1201(19) in interpreting § 47–3405 would contradict the plain language and policy of the section. *Western Cas. & Sur. Co. v. Citizens Bank,* 676 F.2d 1344 (10th Cir.1982).

Unlike §§ 47–3406 and 47–4406, § 47–3405 contains no explicit requirement of "ordinary care" or "reasonable commercial standards." The absence of any duty of

care in § 47–3405 is not inadvertent. The section is recognized as a "banker's provision" intended to narrow the liability of banks and broaden the responsibility of its customers. *General Acc. Fire & Life Assur. Corp. v. Citizens Fidelity Bank*, 519 S.W.2d 817, 819 (Ky.1975); *Western Cas. & Sur. Co.*, 676 F.2d at 1348. The policy of § 47–3405 is to place the loss on the party or the person best able to prevent the loss. In the § 47–3405(A)(3) situation, the party best able to prevent the loss is the employer where "the wrong-doing is internal, [and] it is arguably within the drawer's ability to set up a system of controls and safeguards to prevent the embezzlement." R. Harbus, *The Great Pretender—A Look at the Imposter Provision of the Uniform Commercial Code*, 47 Cin.L.Rev. 385, 395 (1978).

The only relevant inquiry under § 47–3405 is whether the Bank acted in good faith. "The [good faith] test requires honesty of intent rather than absence of circumstances which would put an ordinarily prudent holder on inquiry in order to constitute good faith.... [It] is an issue of honesty of intent rather than of diligence or negligence." *Eldon's Super Fresh Stores, Inc. v. Merrill Lynch, Pierce, Fenner & Smith*, 296 Minn. 130, 136, 207 N.W.2d 282, 287 (1973). Therefore, we do not consider the City's allegations that the Bank was negligent and/or grossly negligent, but only whether the Bank acted in good faith.

The City asserts that the Bank acted in bad faith and was precluded from using § 47–3405(A)(3) as a defense. According to the City, the Bank's bad faith is evidenced by "a *course of dealing* so irregular in nature that Great Western Bank is shown to have violated its own policy." (Emphasis added.) "Course of dealing" is defined in § 47–1205 as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." It is a term often associated with 47–2101 et seq., the Sales provisions of the UCC. The provision allows the parties to an agreement to show a prior sequence of events or conduct in order to establish the true meaning of their agreement. In applying a "course of dealing" to a specific contract, the emphasis is on a sequence of events; a single transaction cannot constitute a course of dealing. *International Therapeutics, Inc. v. McGraw-Edison Co.*, 721 F.2d 488 (5th Cir. 1983).

The term "course of dealing" is not implied, referenced or applicable to transactions involving Commercial Paper (§ 47–3101, et seq.). Unlike a sales contract under the Sales provisions (§ 47–2101 et seq.), we are not here concerned with the common understandings between the parties. The parties' relationships and contracts are expressly set forth in the Commercial Paper provisions; prior or subsequent events between them cannot alter the terms or understanding of the statutory contract. The focus of the good faith requirement of § 47–1201(19) is on the "conduct or transaction concerned"; that is, one particular transaction or proceeding. "Honesty in fact in the conduct or transaction concerned" refers to honesty in a particular transaction or incident. It does not depend on an analysis of preceding and subsequent unrelated and dissimilar events or transactions. It stands in direct contrast to "a course of dealing" which focuses on a *series* of events and dealings. In its briefs, the City repeatedly refers to a course of transactions involving not only the passing of the warrant by Hann to the Bank, but also the prior opening of the Hann account at the Bank, and the subsequent withdrawals from the Hann account. The City concludes that the sum of the transactions and each part should have alerted the Bank that something was wrong. Good faith as defined in § 47–1201(19), however, entails "honesty in fact in the conduct or transaction concerned," which is a single discrete event, not a series of events or transactions. *But see, Kraftsman Container Corp. v. United Counties Trust Co.*, 169 N.J.Super. 488, 497, 404 A.2d 1288, 1293 (1979) (bank's conduct over "entire four-year period" in paying numerous checks

lacking any endorsement, lacking required endorsements, and containing illegible endorsements is "to be viewed as a whole, since bad faith may be evidenced by a consistent failure by the bank to monitor and investigate a series of irregular transactions"). Therefore, we first consider the Bank's. "good faith" in the critical transaction (or the "critical moment" to use the words of the City) which had a direct effect on the City: the passing of the warrant.

The City claims that the Bank should have realized that the circumstances of the deposit of the warrant were suspicious and therefore it should have carefully investigated the warrant before accepting it. But, the City concedes that there is no evidence that any Bank employee acted as a confederate with either Maisel or Hann. The facts the City points to are: the youth of the depositor, the amount of the warrant (approximately 2.5 percent of the branch's average daily deposit), and the proximity in time of the deposit to the opening of the account by a depositor previously unknown to the Bank. Although the opinion of the City's expert is replete with conclusions regarding the liability of the Bank, the material facts upon which he and the Bank's expert base their opinions are not in dispute. The trial court was not bound by the opinion of the City's expert witness with respect to the conclusion that the Bank acted in bad faith. Rule 56(e), Arizona Rules of Civil Procedure; *see Cook v. Great Western Bank*, 141 Ariz. 80, 87–88, 685 P.2d 145, 152–53 (App.1984).

█ The facts pointed to by the City do not indicate a lack of good faith on the part of the Bank. The warrant was made payable to the order of the named depositor. It was appropriately endorsed by him and deposited in his account at the Bank. There were no alterations on the face of the warrant nor were there any other suggestions sufficient to invoke a duty to inquire in connection with the deposit. Mere negligence or knowledge of suspicious circumstances is not sufficient to show bad faith. *Valley Nat'l Bank v. Porter*, 705 F.2d 1027, 1029 (8th Cir.1983). From these

facts the trial court correctly decided as a matter of law that the Bank acted in good faith—with "honesty in fact in the conduct or transaction concerned."

The City urges us to consider the circumstances surrounding the opening of the account by Hann in determining the Bank's good faith in accepting the warrant. This we refuse to do because the opening of the account is unrelated to the passing of the warrant and dissimilar in nature. It is not part of the "conduct or transaction concerned," the passing of the warrant.

If the conclusions set forth in the opinion of the City's expert could be said to present a genuine issue of material fact, we would necessarily reverse for trial. However, we reject the argument that the opinion expressed constitutes a material fact pursuant to rule 56(c). The trial court was correct in determining that the facts presented, contrary to the opinion of the expert for the Bank, required it to hold as a matter of law that the Bank acted in good faith in accepting the warrant.

Although the determination that the Bank accepted the warrant in good faith is dispositive of this case, we proceed to discuss the other arguments offered by the City.

█ The City claims that the Bank's opening of the Hann account in the name of Duncan Industries was in bad faith. This claim is based on allegations that the Bank violated its own operations manual in opening the account. First, while two forms of identification are required by the Bank's operations manual when opening an account, the Bank accepted only one form of identification specifically listed in the operations manual and a hospital patient card from Hann. Second, the Bank did not attempt to verify the bank reference or any of the information given about Duncan Industries by Hann. While the Bank could have investigated further, these facts do not suggest that the account was opened without "good faith" as defined by § 47–1201(19). The Bank is not required to make a complete security and credit check on everyone who wants to open a checking

account. Under a subjective standard, such as that of "honesty in fact," an absence of knowledge is not equivalent to a lack of good faith. *Money Mart Check Cashing Center, Inc. v. Epicycle Corp.*, 667 P.2d 1372 (Colo.1983).

▪ The City also claims that but for the Bank's negligence in opening the account, the fraudulent warrant check would not have been passed. This assertion has no merit. The Bank's lack of good faith, notice or negligence cannot be judged by looking at unrelated and dissimilar transactions as though they were one incident. Rather, lack of good faith must be established by reference to the conduct or transaction concerned. In the opening of the account, the Bank acted in good faith with honesty in fact.

▪ The City argues that the Bank acted in bad faith in allowing Hann to withdraw almost the full amount of his deposit within ten days after the deposit of the warrant. In support of this allegation the City points to the manner in which the withdrawals were made: that they were in multiple cashier's checks for identical amounts payable to coin and stamp or diamond and bullion dealers. The City, through its expert, states that such a course of transactions on a previously unknown account is inherently suspicious and unusual. Again, the City adverts to a *course of transactions.* As previously discussed "honesty in fact" refers to "the conduct or transaction concerned" and not a course of unrelated and dissimilar transactions. The only relevant inquiry as to good faith in the withdrawal transactions is whether or not the Bank acted with honesty in fact in allowing Hann to withdraw almost the full amount of the warrant.

In his affidavit, the City's expert gave his opinion regarding the withdrawals as follows:

The [Bank] branch further willfully and intentionally and recklessly failed to investigate suspicious circumstances regarding the withdrawal activity on the [Hann] account by still failing to conduct any inquiry and investigation regarding the account or an inquiry of the City of Phoenix given the huge volume of withdrawals which commenced at the branch on the very day the "hold" was released on the item. The withdrawals [by Hann] primarily consisted of multiple Cashier's Checks for identical amounts payable to stamp and coin and bullion dealers. That such a course of transactions on a previously unknown account is inherently suspicious and unusual and this is further manifested by the fact that the instruments were made for amounts just under the next higher round number of $5,000.00 or $50,000.00; this suggests that the depositor [Hann] believed that he could avoid some sort of reporting thresholds triggered by the next higher round number and thus may have triggered more supervision or investigation by the bank. The suspiciousness of the withdrawals is further apparent from the fact that 17 Cashier's Checks were obtained in a period of five (5) banking days and each was approved by branch personnel. Despite the huge amounts, suspiciousness and frequency of the withdrawals, apparently no procedures were instituted by the branch for reviewing these transactions nor did any of these transactions prompt inquiry or investigation of the account or inquiry of the City of Phoenix.

The City characterizes the withdrawals as "facially suspicious" and "inherently suspicious" in its brief. The City suggests the "inference" that the checks were drawn for just under $5,000 or $50,000 because "Hann was afraid that transactions over the immediately higher round number would trigger more supervision of investigation by the Bank." The City acknowledges, however, that since cashier's checks were involved rather than cash, there was no requirement to report the transactions to the Internal Revenue Service. The City does not suggest what reporting thresholds were sought to be avoided by Hann. When the conclusionary, speculative, and argumentative opinions are stripped away, the facts show nothing

other than the Bank acting in good faith. The trial court correctly concluded that the Bank did act in good faith in the withdrawal transactions.

 Summary judgment is properly granted only where there is no genuine dispute as to a material fact, only one inference can be drawn from the undisputed material facts, and the moving party is entitled to judgment as a matter of law. Rule 56, Arizona Rules of Civil Procedure; *State ex rel. Corbin v. Sabel*, 138 Ariz. 253, 255, 674 P.2d 316, 318 (App.1983). In reviewing summary judgment, we must view the evidence most favorable to the party against whom summary judgment was entered, and give the appellant the benefit of all reasonable inferences to be drawn from the record. *Id.*

In the case at bar, we find no genuine issue of material fact as to the good faith of the Bank. The definition of good faith is "honesty in fact in the conduct or transaction concerned." If jurors in applying the law to the uncontroverted facts could reach only one conclusion, then summary judgment is proper. No evidence that the Bank acted in any way other than in honesty in fact was presented. Therefore, a trier of fact could only reach the conclusion that the Bank acted with honesty in fact. *See Kersten v. Continental Bank*, 129 Ariz. 44, 48, 628 P.2d 592, 596 (App.1981). *Compare Continental Bank v. Wa-Ho Truck Brokerage*, 122 Ariz. 414, 595 P.2d 206 (App.1979) (summary judgment improper on issue of substantial contribution defense, § 44-2543 [now § 47-3406], where there was a factual dispute as to whether Bank acted in accordance with reasonable commercial standards).

In the instant case there were three distinct transactions: the opening of the bank account, the deposit of the warrant, and withdrawals from the bank account. The only transaction relevant to our inquiry of good faith is the deposit of the warrant. The trial court correctly decided that the warrant was deposited in good faith. We further note that the opening of the account and the withdrawals were conducted

in good faith, so that even if "conduct or transactions concerned" was interpreted as the interrelation of the three events, the trial court was justified in concluding that the Bank acted in good faith.

The facts relating to the opening of the account do not provide foresight to anticipate the deposit of a fraudulent warrant; nor, do the circumstances of the withdrawals provide hindsight that a fraudulent warrant had been passed. Clearly, good faith neither requires 20/20 foresight nor 20/20 hindsight as to preceding and subsequent unrelated and dissimilar events and transactions.

We therefore affirm the summary judgment in favor of the Bank.

### 3. *Attorney's Fees*

The Bank cross-appeals on the grounds that it was entitled to an award of attorney's fees in the trial court pursuant to A.R.S. § 12–341.01 or § 12–348. The trial court denied the request *as a matter of law* concluding that both sections are inapplicable. There is no merit to the Bank's argument that § 12–348 at the time of this dispute included governmental entities other than the state. *Lacer v. Navajo County*, 141 Ariz. 392, 395, 687 P.2d 400, 403 (App.1984). A.R.S. § 12–348 has subsequently been amended to include cities, towns, and counties. Laws 1984, Ch. 359, § 1.

 The Bank's argument under § 12–341.01 does have merit however. The City argues that its claim sounds in tort, that a bad faith claim exists independent of contract. We do not agree. In *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 544, 647 P.2d 1127, 1142 (1982), *cert. denied*, 495 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 362 (1982) our supreme court stated that a "tort [which] is so intrinsically related to the contract ... is one 'arising out of a contract' within the meaning of § 12–341.01(A)." The City's complaint explicitly alleged a violation of the UCC through misconduct which amounted to bad faith. If not apparent from the nature of express and implied duties concerning

**62**

checks, A.R.S. § 47–1203 explicitly references "contract." Contract is defined in § 47–1201(11) as the "total legal obligation which results from the parties' agreement as affected by this title and any other applicable rules of law." "Agreement" is defined by 47–1201(3) as "the bargain of the parties in fact as found in their language or by implication...." Article 3 establishes a series of contractual relations between the parties to a negotiable instrument. *See* A.R.S. §§ 47–3414 through 47–3417. Similarly Article 4 delineates the obligations and responsibilities between various banks and between banks and its customers. *See* A.R.S. §§ 47–4207 and 47–4406. Finally, we note that awards of attorney's fees have been approved on appeal in other, similar cases. *E.g., First Nat'l Bank v. Continental Bank,* 138 Ariz. 194, 673 P.2d 938 (App.1983); *Valley Nat'l Bank v. Cook,* 136 Ariz. 232, 665 P.2d 576 (App.1983).

We affirm the trial court's order granting summary judgment. We reverse the order denying attorney's fees and remand to the trial court to *consider* the Bank's request for attorney's fees pursuant to A.R.S. § 12–341.01. The trial court has discretion to grant or deny attorney's fees. *Associated Indem. Corp. v. Warner,* 143 Ariz. 567, 694 P.2d 1181 (1985). We award the Bank attorney's fees on appeal in accordance with rule 21, Arizona Rules of Civil Appellate Procedure.

FROEB and OGG, JJ., concur.