NEW AMSTERDAM CASUALTY COM-
PANY, Appellant,

v.

The FIRST PENNSYLVANIA BANKING
AND TRUST COMPANY

v.

Morton N. NEUFELD et al.

No. 19424.

United States Court of Appeals,
Third Circuit.

Argued Sept. 14, 1971.

Decided Nov. 10, 1971.

As Amended Dec. 15, 1971.

C. Clark Hodgson, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for appellant.

Joseph Head, Swartz, Campbell & Detweiler, Philadelphia, Pa., for First Penna. Banking and Trust Co.

Before STALEY, ADAMS, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The question here is whether an employee supplied to his employer the names of payees within the meaning of Section 3–405(1) (c) of the Uniform Commercial Code, Tit. 12A Pa.Stat.Ann. § 3–405(1) (c), intending the payees to have no interest in the proceeds of the checks. If Emanuel Wexler, an employee of E. W. Smith Co. [Smith], did so, his forged indorsements on the checks are effective as between Smith and The First Pennsylvania Banking and Trust Co. [Bank] which charged Smith's checking account with the sum of the checks.

Preliminarily, several points must be dealt with in the interest of clarity. The plaintiff in the action before us is Smith's insurer. After forged indorsements by its employee, Wexler, were discovered by Smith, New Amsterdam Casualty Co., pursuant to the employee dishonesty provisions of its fidelity bond, paid Smith's losses. All of Wexler's peculations relate to his employment at Smith and since Smith has assigned its rights to New Amsterdam, New Amsterdam will be referred to as Smith for the purposes of this opinion.

Jurisdiction in this case is based on diversity, 28 U.S.C. § 1332, thus, we are required to apply Pennsylvania law and, in effect, to sit as an appellate court of that state. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Because the Supreme Court of Pennsylvania has never passed on the precise point of law *sub judice*, this opinion expresses our view on the way that Court would decide the question if presented there. *Cf.* Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); Erie R. Co. v. Tompkins, *supra*.

The case came on for a jury trial September 16, 1970. At the close of the evidence, both the Bank and Smith moved for directed verdicts under Rule 50, Fed.R.Civ.P. The District Court granted the Bank's motion, denied Smith's motion, and entered judgment in the Bank's favor.[1]

The essential facts adduced at the trial are not in dispute. Rather, the controversy centers on the legal conclusion to be drawn from the evidentiary premises.

Wexler, from 1959 until he was discharged on January 14, 1965, was employed by Smith as a registered representative. During a period lasting almost two years, Wexler improperly obtained some 47 checks made out to customers of Smith with a total value of $88,213.82, forged the customers' endorsements on the reverse side of the checks, cashed the checks at check cashing agencies and other banks and then converted the proceeds to his own use.[2]

In order to comprehend Wexler's machinations, it is necessary to examine the normal course of customer relations at Smith, as evidenced by the record. For purposes of this opinion we may assume that Smith's customers all had either cash accounts or margin accounts. A customer having a cash account would effectuate a sale of his shares by first calling his registered representative in order to authorize the sale. The broker would then forward the sell order in writing to one of Smith's traders who com-

---

1. Because of this procedural posture, the third-party defendants are not parties to this appeal.

2. During the course of pre-trial proceedings, Smith withdrew its claim on one of the checks, thereby reducing the number to 46, and the dollar amount to $87,896.44.

pleted the transaction on the appropriate exchange. The order form contained the name of the customer, the name and type of security to be sold, the number of shares and price, and the disposition of the funds.[3] Following the sale, a ticket was made up in the trading room containing essentially the same information as the broker's sell order. A confirmation was later prepared showing the proceeds of the transaction less deductions for commission and taxes. One copy of this confirmation was sent to the customer, and one to Smith's cashier's cage where a credit would be entered on the client's account, or, if indicated, a check prepared to the client's order on the fourth trading day following the sale. The check would, normally, be forwarded to the customer by mail.

Wexler turned this course of business into a money-making venture. Aware of the quantity and type of stock which his customers kept on account at Smith, Wexler would, without authorization from a customer, fill out a sell order with appropriate [4] and verifiable information. The following day, Wexler would stop by the desk where confirmations were typed out, and tell the secretary that since he, Wexler, was going to see the customer he would take the confirmation slip and give it to the customer personally. Wexler would not transmit the slip and the customer, of course, never received the confirmation. Then, on the fourth trading day following the sale, when he knew the check would be prepared pursuant to the course of events which he had initiated, Wexler would approach Smith's cashier with the same story he had given the person preparing confirmations, adding, however, that the customer had authorized Wexler's receipt of the check. After receiving the check, Wexler would forge on the reverse side of it the indorsement of the payee and either deposit the check in one of Wexler's accounts at banks other than First Pennsylvania, or cash the checks with one of the third-party defendant check-cashing agencies. In no case did the checks go directly from Wexler to the First Pennsylvania.

A slightly different method was employed by Wexler to extract money from the margin accounts of his clients. These accounts represent stock which had been placed with the brokerage house as collateral for a loan. The maximum permissible amount of the loan is a percentage, determined by the Federal Reserve Board, of the market value of the stock. It is possible for such accounts to have a "credit" in favor of the customer. For example, if the margin rate is 40%, and Mr. X places in a margin account 100 shares of General Motors with a present market value of $70 per share, he could qualify for a loan from Smith of $2,800 (.40 x 100 x $70). If at some time later the value of General Motors stock had risen to $100 per share, Mr. X would qualify for an additional loan of $1,200 (.40 x 100 x [$100–$70]). In such fashion, a "credit" could be generated. Following Smith's normal procedure, if Mr. X now desires a check for the $1,200, he either calls his representative at Smith who conveys the request to the cashier, or Mr. X may approach the cashier directly for the funds. In either case, the cashier, after verifying the existence of an equity, would prepare the check and hand it personally to Mr. X or mail it to him.

In order to accomplish the fraud with the margin accounts, Wexler first had to analyze his customers' accounts to determine if a credit existed, and if so, in what amount. He would then approach the cashier and request the specific amount of the credit available. Again, under the guise of authority to make personal delivery, Wexler would obtain the check, place an improper indorse-

---

3. Unless otherwise indicated, the funds were credited to the customer's accounts in lieu of cash settlement.

4. To receive the cash, he always checked the space on the order marked: "Proceeds to be remitted."

ment on the reverse side, cash it, and convert the funds to his personal use.

During the course of his misdeeds, Wexler was forced to overcome many stumbling blocks, all of which point to the nature and depth of the improper appropriations present here. Beginning in early 1964, the secretaries who typed the confirmations refused to give them directly to Wexler. He was then required to intercept them from Smith's outgoing mail. Because Smith sent monthly statements to margin-account customers, Wexler prepared false monthly statements at home and substituted them for the legitimate statements prepared by Smith. A number of Smith's customers began to question Wexler as to the validity of the statements. Some were assuaged when informed that the discrepancies were nothing more than bookkeeping errors. Other customers, however, were satisfied only when Wexler confessed his scheme, and were offered payments in return for their silence. Such payments to one customer, alone, were estimated by Wexler to be $20,000.

With Wexler's scheme having been described sufficiently to form a meaningful backdrop, we may now address ourselves to the question whether Wexler as "an agent or employee of the maker supplied" Smith with the name of the payees [the customer] intending the customer to have no interest in the proceeds of the check.[5]

Our research has failed to unearth any Pennsylvania cases and very few in other jurisdictions construing Section 3–405(1) (c) of the Uniform Commercial Code. Notwithstanding the paucity of cases nationwide on this point, Smith argues that although it is clear Wexler in fact supplied the name of the payee

to Smith, in legal contemplation, not Wexler, but Smith's standard operating procedure supplied the name of the payee to the person preparing the check. This line of reasoning, while superficially appealing, fails to take full account of the stated purpose and history of Section 3–405(1) (c), and is based upon a misinterpretation of the case relied on most heavily by Smith.

Section 9(3) of the Negotiable Instruments Law, Tit. 56 Pa.Stat.Ann. § 14(repealed), predecessor to Section 3–405 of the U.C.C., stated: "The instrument is payable to bearer * * * when it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable * * *." When these conditions were met, the maker was liable on his check in that he had no recourse against the drawee bank which had charged his account, because the instrument became bearer paper requiring no indorsement for negotiation. The term, "nonexisting person" under the Negotiable Instruments Law was interpreted to mean one who "was not intended to be the payee by the drawer," Commonwealth v. Globe Indemnity Co., 323 Pa. 261, 266, 185 A. 796, 798 (1936). This construction made the pivotal point in such cases whether the drawer or maker intended the named payee to receive the proceeds of the check.

By thus focusing on the intent of the drawer, Section 9(3) of the Negotiable Instruments Law made irrelevant the intent of the defrauding employee. The importance of this concept and its relationship to the enactment of Section 3–405(1) (c) and the facts of the present appeal may be demonstrated by a brief discussion of two Pennsylvania cases decided while Section 9(3) was the law.

5. Section 3–405 of the U.C.C. reads in full:
"(1) An indorsement by any person in the name of a named payee is effective if
(a) an imposter by use of the mails or otherwise has induced the maker or drawer to issue the instrument to him or his confederate in the name of the payee; or

(b) a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument; or
(c) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest."
Subsection (c) is our only concern in this case.

In National Union Fire Ins. Co. v. Mellon National Bank, 276 Pa. 212, 119 A. 910 (1923), plaintiff insurance company had as its general agents in New York City, James & Co. James was authorized to place insurance, adjust losses, and draw drafts on the plaintiff's account for payment. They employed a loss clerk, who, during his tenure, presented James with proofs of loss on properties insured by the plaintiff for fires which had never occurred. On receipt of the drafts, the employee forged the indorsements and converted the proceeds to his own use. In a suit brought by the insurance company against the drawee bank to recover the amount of the checks thus charged against its bank account, the Supreme Court of Pennsylvania held that because both the preparer of the drafts, James, and the drawer, the insurance company, had intended the proceeds to go to real persons, the fact that the employee who supplied the name of the payee had no such intent did not work to bring the drawee bank within the protection of Section 9(3).

In the later case of Commonwealth v. Globe Indemnity Co., *supra*, the result was similar to that reached in *National Union*. By statute, Pennsylvania was required to pay compensation for tubercular cattle which it condemned and slaughtered. The particular department taking such action prepared papers covering each case and forwarded them to the auditor general and treasurer so that a check would be made payable to the owner of the cattle. A clerk, employed by the State in the department which assembled the papers for forwarding, placed false claims among the legitimate ones, and in the normal course of business, checks were mailed to both the real and fraudulent claimants. At the Post Office, the employee would pose as the [fictitious] payee, forge the indorsements, and cash the checks. The Commonwealth recovered from the defendant surety based on a holding identical with that in *National Union, supra.*

Had the present appeal been argued at the time *National Union* and *Globe* were decided, and assuming the application of Erie v. Tompkins, a reversal would be in order. We would ignore the intent of the employee, Wexler, and look only to that of Smith in preparing the checks. The payees of all the checks in question were customers of Smith. Because Wexler had first checked the books, a reverification of the books by Smith would show that the transactions were colorably legitimate. Therefore, Smith would intend the named payees to have the checks, and under Section 9(3) the instruments would be order paper, negotiable only with proper indorsements.

A relevant inquiry is whether Section 3–405(1) (c) of the U.C.C. was intended to change the result in *National Union* and *Globe* and if so, in what way. Official comment 4 to Section 3–405 is somewhat helpful in this regard.[6] It states:

"Paragraph (c) is new. It extends the rule of the original Subsection 9(3) to include the padded payroll cases, where the drawer's agent or employee prepares the check for signature or *otherwise furnishes the signing officer with the name of the payee.* The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the

6. It should also be noted that the Pennsylvania Bar Association notes to Section 3–405, written in 1953, recognize that subsection (1) (c) was meant to change the results in these two cases. *See* Tit. 12A Pa.Stat.Ann. § 3–405, notes.

holder or drawee." (Emphasis added).

■ Clearly, the protection afforded the drawee bank under 3–405(1) (c) is much broader than that afforded by Section 9(3). Whereas Section 9(3) held the bank harmless only when the fraud involved was that of the actual drawer or maker of the check, Section 3–405(1) (c) extends that protection when the fraud is committed in the drawer's establishment, whether by the maker himself or by some subordinate employee who furnishes the name of the payee. The word "supplied" in (1) (c) must, therefore, cover cases running from the padded payroll to the one in which an employee starts the wheels of normal business procedure in motion to produce a check for a non-authorized transaction.

In arguing against this result, Smith contends that "supplied" is given meaning by analyzing the distance between the dishonest employee and the physical preparation of the check. Smith contends that many other departments had to verify customers' accounts before the checks issued, and, in effect, these other departments, and not Wexler, supplied Smith with the name of the payee. The actual steps here were Wexler to trader to confirmation typist to cashier. Smith's argument does not indicate where the line should be drawn, and indeed cannot. It is possible that a trader would fabricate a stock sale, or a secretary would type false confirmations and then proceed in Wexler's manner. Verification operations would be performed by Smith prior to the issuance of a check in each of these cases, although the number of steps in the operation may be fewer than in Wexler's situation. We have no way of ascertaining under Smith's proposed test whether either of these employees would have "supplied" the name of the payee to Smith, as that term is used in Section 3–405(1) (c).

■ In the interest of business and bank stability, it is important that a reasonably clear line be drawn. Our decision places the burden on the drawer who, in the words of the official comment, is "in a better position to cover the loss by fidelity insurance * * *", U.C.C. § 3–405, comment 4.

Snug Harbor Realty Co. v. First National Bank, 105 N.J.Super. 572, 253 A. 2d 581, aff'd., 54 N.J. 95, 253 A.2d 545 (1969), cited on numerous occasions by both parties, is the only case we have found which deals with Section 3–405(1) (c), holding in favor of the drawer. There, an employee of the plaintiff construction company, Magee, was their superintendent. Parties asserting that plaintiff Snug Harbor owed them money would submit their invoices to Magee, who, after investigation to determine that the work was done, initialed the invoices and forwarded them to Snug Harbor's bookkeeper who verified the contractual obligation and prepared the checks. Magee then picked up the checks for delivery, forged the indorsements and converted the proceeds to his own use. Upon discovery of the forgeries, Snug Harbor sued the drawee bank. It was held that Snug Harbor had made out a prima facie case, and that Section 3–405(1) (c) had no application. The court found the operative fact to be that, "the payees were *bona fide* creditors of the company who had respectively submitted their invoices for work performed or materials furnished." 253 A. 2d at 582. Therefore, the creditors themselves "supplied" Snug Harbor with the names of the payees, and Magee, in essence, stole the checks, thereby making his forged indorsement ineffective as between the drawee, Snug Harbor and the Bank.

Smith contends that the facts of its case are similar to those of *Snug Harbor*. The analogy is not apt because none of the transactions initiated by Wexler were bona fide, while those involved in *Snug Harbor* were. Smith chooses to view the existence of an internal verification by *Snug Harbor's* bookkeeper as pivotal, while, as noted above, we interpret the case to hold that

the bona fides of the underlying transaction is the controlling factor.[7]

Smith's final claim is that the customers in this case were its bona fide creditors. There is little merit to this contention. When a broker, without authorization, sells a customer's stock, the customer has a right either to the stock itself or to the price for which it was sold. So long as the broker retains the stock certificate, the customer is entitled only to it and not the cash equivalent of its market value. In the absence of Wexler's deceit, the customers could not be considered creditors of Smith because Smith would not have owed them money.

■ For the purpose of giving meaning to the word "supplied" in Section 3–405(1) (c), we can find no viable place to draw the line within the business enterprise of the drawer. Accordingly, in the context of the facts here, the only rational distinction lies between bona fide and fraudulent transactions because it is only in the case of a bona fide transaction that anyone other than the faithless employee may be said to have supplied the name of the payee to the company. When Wexler, by submitting the fraudulent sell order to the trading room at Smith, initiated normal business practice to produce a check payable to a named payee, and Wexler intended the payee to have no interest in the proceeds of the check, he "supplied" Smith with the name of the payee thereby making his forged indorsement effective as between Smith and the drawee Bank.

Thus, the Bank properly charged Smith's account for the checks in question and, therefore, the granting of the Bank's motion for a directed verdict was correct. Accordingly, the judgment of the District Court will be affirmed.

---

7. Smith concedes in its brief that, at a minimum, § 3–405(1)(c) was intended to protect the bank in the typical padded payroll or fraudulent invoice case. By changing the facts of *Snug Harbor* to correspond to those of the present appeal, the result is nothing more than a typical fraudulent invoice case. Magee would submit fabricated invoices to *Snug Harbor's* bookkeeper. It would not matter whether the person who supposedly submitted the invoice were real or not because one of the goals of Section 3–405 is to eliminate the concept of the fictitious payee. On these facts, Magee clearly would have supplied the name of the payee to *Snug Harbor*, and the Bank would not have been liable. Similarly, Wexler supplied the names of the payees to Smith.