**SHEARSON LEHMAN BROTHERS, INC., successor in interest to Shearson Lehman Hutton, Inc., Plaintiff,**

v.

**WASATCH BANK, a Utah banking corporation, Defendant.**

No. 90–C–814A.

United States District Court, D. Utah, C.D.

March 30, 1992.

See also 139 F.R.D. 412.

Linda J. Barclay, Howard, Lewis & Petersen, Provo, Utah, for plaintiff.

John T. Anderson, Parsons, Behle & Latimer, Salt Lake City, Utah, for defendant.

## ORDER

ALDON J. ANDERSON, Senior District Judge.

Before the court is Defendant's Motion for Summary Judgment. The core issue presented by the motion is whether and to what extent a collecting or depositary bank will be liable to the drawer or the unintended payee of a check when the drawer's faithless employee induces the drawer to issue checks, fraudulently indorses them in the name of the specified payee, and absconds with the funds. Because under the undisputed facts of the case, the "fictitious payee" defense as codified by section 3–405 of the Uniform Commercial Code affords the defendant an absolute defense to all claims, summary judgment for the defendant is hereby granted.

The present litigation between plaintiff Shearson Lehman Brothers, Inc., ("Shearson") and defendant Wasatch Bank ("Wasatch") arises out of the activities of a former employee of Shearson, Stanley A. Erb ("Erb"). Erb began working as a financial consultant or broker at Shearson's Provo, Utah, branch office in 1984. By 1987, because of the volume of his sales, Erb had been given the cognomen of vice president. In 1987, Erb was contacted by McKay Matthews, the controller for the Orem, Utah, based Wordperfect Corporation, and its sister corporation, Utah Softcopy. On Matthews' request, Erb coordinated the establishment of three separate investment accounts at Shearson. The accounts were for the benefit of Wordperfect and Utah Softcopy as corporations and one account was established for the personal benefit of the Wordperfect principals, Allen C. Ashton, Bruce W. Bastian, and Willard E. Peterson. Thereafter, Erb assumed the responsibility for managing all three of the Wordperfect accounts at Shearson.

In March 1987, Erb personally accepted from Matthews a check drawn by Utah

Softcopy and payable to the order of "ABP Investments."[1] The amount of the check was $460,150.23. At that time, there was no ABP Investment account opened at Shearson, although the Wordperfect principals maintained accounts elsewhere in that name.[2] Notwithstanding the absence of an account in the name of the payee, Erb accepted the check for deposit at Shearson. Matthews suggested that a substitute check be correctly drawn and submitted for deposit at Shearson. Erb responded by assuring Matthews that he would personally guarantee that the check was credited to the appropriate account. However, rather than depositing the check into one of the authorized Wordperfect accounts, Erb opened a new account at Shearson in the name of "ABP Investments." Erb apparently forged the signature of Bruce Bastian on the new account documents. No evidence in the record suggests that Bastian or any other Wordperfect or Utah Softcopy representative authorized or subsequently ratified the creation of the new account. Erb listed as the address of record for the ABP Investment account a post office box number in Orem, Utah, which was unknown to Wordperfect and its principals and was different from the record address for the other three Wordperfect accounts.

Over the course of the next eleven months, Erb induced Shearson to draft checks on the ABP Investment account, payable to ABP Investments. Erb manipulated Shearson's procedure for making payments to clients by submitting to the Shearson cashier falsified payment request forms. Checks were drawn by Shearson in the requested amounts and were mailed to the Orem post office box. Erb then obtained the checks from the post office box, indorsed them in the name of ABP Investments, and took them to Wasatch for deposit into his personal account. In the course of his scheme, Erb fraudulently procured and negotiated approximately thirty-seven checks, totalling $504,295.30.

Wasatch accepted for deposit and subsequently allowed Erb to withdraw from his personal account all of the funds representing the thirty-seven checks Erb fraudulently procured from Shearson. Copies of those checks reveal that each was drawn payable to the order of ABP Investments and each was indorsed, in handwriting, in the name of ABP Investments and without Erb's personal indorsement or any other indication of Erb's authority to act on behalf of the payee. No ABP Investment account was maintained at Wasatch and therefore no signature card or other evidence on the premises of the bank could have been used to verify Erb's authority to deposit checks payable to ABP Investments. Nor is there any evidence identifying which teller accepted which check, that the tellers who accepted the checks for deposit independently verified Erb's authority to negotiate the checks, or that the checks were approved for deposit by the bank's officers or other managers. In fact, there are conflicting views of what procedures and policies were in effect during the relevant time periods and which would have governed the acceptance by Wasatch of checks for deposit. Leonel Castillo, a long-time management employee of Wasatch, stated in his deposition that there was a $1000 or $2000 teller limit on accepting checks for deposit and that any check exceeding that limit should have been accepted by the teller, but then set aside for subsequent officer review and approval of the transaction. Dep. of Leonel Castillo at 40. Castillo further stated that, prior to accepting a check drawn to a commercial payee into a personal account, the teller should have ascertained the authority of the individual to act for the commercial entity. *Id.* at 43–44.

To the contrary, Helen Cluff, the head teller at Wasatch during the relevant time period, stated in her deposition that there

---

1. "ABP" stands for the first letter in the last names of the three Wordperfect/Utah Softcopy principals, Ashton, Bastian, and Peterson.

2. Matthews testified that, as of March 1987, the only ABP Investment account maintained by Wordperfect or its principals was a tax account at Merrill Lynch. Dep. of McKay Matthews at 57.

was no limit whatsoever on the amount of checks tellers could accept for deposit. Dep. of Helen Cluff, Vol. I., at 26, 46–47. Cluff admitted, however, that, in cases where the teller has no personal knowledge of the customer and the customer's circumstances, the teller should verify that the customer has the authority to deposit a check payable to a commercial entity into the customer's personal account. *Id.* at 27. In this respect, Cluff explained that she knew Erb during the relevant time period, that she knew he worked for Shearson, that he was a frequent customer of the bank whose transactions were historically legitimate, and that he was friendly and courteous to the tellers who helped him. *Id.* at 21–24. Although Cluff testified that she had no direct recollection of specific checks, she vaguely remembered several transactions with Erb and indicated that she did not and would not have inquired of Erb regarding his authority to negotiate checks drawn by Shearson and payable to ABP Investments. *Id.* at 25, 31, 39.

Erb's activities with respect to the ABP Investments account were not discovered until early 1989, by which time Erb had terminated his employment at Shearson. Lori Rogerson, the operations manager at the Provo Shearson office, testified that she had always been aware of the existence of the ABP Investment account, that she understood the initials "ABP" to represent the names of the Wordperfect principals, but that she also assumed the account was legitimately opened and managed by Erb. Dep. of Lori Rogerson at 51. At a meeting with Wordperfect representatives in early 1989, Rogerson peripherally mentioned the ABP Investment account whereupon a Wordperfect representative informed her that neither Wordperfect nor its principals maintained such an account at Shearson. *Id.* at 57–59. After this disclosure, Shearson requested an audit of the accounts managed by Erb and discovered the extent of his mishandling of the ABP Investment account as well as other unrelated mismanagement.

In June 1989, Shearson, Wordperfect and the Wordperfect principals entered a settlement agreement whereby all claims against Shearson arising out of Erb's mishandling of the Wordperfect and related accounts were settled for $1,208,903.[3] Under the agreement, Shearson acquired by assignment or was subrogated to all legal rights of Wordperfect, Ashton, Bastian and Peterson.[4] Shearson subsequently initiated the present suit against Wasatch. Shearson's complaint alleges the following causes of action: (1) common law negligence, specifically, that the deposits were suspicious, Wasatch knew Erb was employed by the drawer of the checks he deposited into his personal account, and Wasatch made no reasonable attempt to determine the authenticity of endorsements; (2) breach of warranty of good title and implied covenant of good faith and fair dealing in that Wasatch failed to follow reasonable commercial banking practices; (3) common law action for monies had and received; and (4) common law conversion.

Wasatch subsequently moved for summary judgment and asserts as the basis for that motion the following four arguments: (1) the "fictitious payee defense," U.C.C. § 3–405(1)(c), bars all of Shearson's claims; (2) Shearson's claims are barred by the applicable statutes of limitation; (3) Shearson lacks standing to bring claims against Wasatch; and (4) the U.C.C. precludes Shearson's common law causes of action for conversion, negligence, and monies had and received.

■ The court must grant Wasatch's motion for summary judgment if, based upon the pleadings, affidavits, depositions and other evidence heretofore presented, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ. Pro. 56(c). "The moving party carries the burden of showing beyond a reasonable

---

**3.** Included in the settlement agreement were other claims of Wordperfect relating to Shearson's mismanagement of three other investment accounts.

**4.** It is unclear on the face of the document and the parties dispute whether, under the agreement, Shearson acquired the rights and interest of Utah Softcopy.

doubt that it is entitled to summary judgment." *Ewing v. Amoco Oil, Co.*, 823 F.2d 1432, 1437 (10th Cir.1987) (citation omitted). The court must view summary judgment evidence and the inferences based thereon in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Mosier v. Maynard*, 937 F.2d 1521, 1524 (10th Cir.1991). Once the moving party has adduced competent evidence in support of its motion, however, the nonmovant must "go beyond the pleadings and by … affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1230 (10th Cir.1990). In determining whether disputed factual issues remain, the court will not weigh the evidence but is limited to inquiring whether a reasonable jury, given the evidence adduced by the parties, could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, a mere scintilla of evidence in support of the nonmovant's position will not defeat the motion. *Id.* at 252, 106 S.Ct. at 2512. Summary judgment is appropriate if the "opponent's evidence is 'merely colorable' or anything short of 'significantly probative' on a material issue." *Mosier v. Maynard*, 937 F.2d at 1524 (quoting *Anderson*, 477 U.S. at 249-50, 106 S.Ct. at 2510-11). Lastly, all facts set forth with particularity by the movant are "deemed admitted for the purpose of summary judgment, unless specifically controverted by the statement of the opposing party." District of Utah Rules of Practice 202(b)(4) (1991).

■ As an additional preliminary note, the court parenthetically recites its allegiance to the long standing rule that a federal court sitting by diversity jurisdiction, *see* 28 U.S.C. § 1332, must apply the substantive law of the state in which the federal court is located. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Brady v. Hopper*, 751 F.2d 329, 332 (10th Cir.1984). Thus, the statutes and common law of Utah will govern the present dispute. Furthermore, when the issues *sub judice* involve questions on which the courts of the relevant state have not yet passed, the federal court must decide the case according to its assessment of how the state high court would rule were the unresolved issues presented to it. *Weiss v. United States*, 787 F.2d 518, 525 (10th Cir.1986). When making such an assessment, the federal court may consider all available resources, including treatises, law reviews and well-reasoned authority from other jurisdictions. *Schoepe v. Zions First Nat'l Bank*, 750 F.Supp. 1084, 1087 (D.Utah 1990), *aff'd*, 952 F.2d 1401 (10th Cir.1992).

### Discussion

#### I. Whether Shearson's claims are barred by the "Fictitious Payee" Defense of U.C.C. 3-405(1)(c).

■ Wasatch acknowledges that, "[a]s a general rule, 'forged indorsements are ineffective to pass title or to authorize a drawee to pay.'" *Western Casualty & Sur. Co. v. Citizens Bank*, 676 F.2d 1344, 1345 (10th Cir.1982) (quoting James J. White & Robert S. Summers, *Handbook of the Law under the Uniform Commercial Code* § 16-8, at 631 (2d ed. 1980)); *see also* Utah Code Ann. § 70A-3-404(1) (1990) ("Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it"); *City of Phoenix v. Great W. Bank & Trust*, 148 Ariz. 53, 712 P.2d 966, 969 (Ct.App.1985); *Consolidated Pub. Water Supply Dist. No. C-1 v. Farmers Bank*, 686 S.W.2d 844, 849-50 (Mo.Ct.App.1985). Consequently, when a collecting bank makes payment over a forged indorsement, it is generally liable for the amount paid. *See, e.g., Western Casualty & Sur.*, 676 F.2d at 1345 ("Ultimately the loss is generally borne by the person who forged the indorsement or the party who took the instrument from the forger."); *McCarthy, Kenney, & Reidy,*

*P.C. v. First Nat'l Bank,* 402 Mass. 630, 524 N.E.2d 390, 392 (1988) (Code warranty provisions result in loss being allocated to the bank initially paying over the forged indorsement); *Kraftsman Container Corp. v. United Counties Trust Co.,* 169 N.J.Super. 488, 404 A.2d 1288, 1291 (Law Div.1979) ("The basic rule is that a bank which pays a check on a forged instrument is liable"); *Fidelity & Casualty Co. v. First City Bank,* 675 S.W.2d 316, 317 (Tex. Ct.App.1984) (same).

Under this general rule, Wasatch clearly would be liable as the party that accepted checks over forged indorsements. Wasatch attempts to avoid such liability, however, by invoking what is known as the "fictitious payee" defense. The defense is an exception to the general rule that a party accepting or paying an instrument over a forged indorsement ultimately will be liable for the loss and is set forth in section 3–405 of the Uniform Commercial Code:

> (1) An indorsement by any person in the name of a named payee is effective if
>
> \* \* \* \* \* \*
>
> (c) an agent or employee of the maker or drawer has supplied him [the drawer] with the name of the payee intending the latter to have no such interest.

Utah Code Ann. § 70A–3–405(1)(c) (1990). The official comment to section 3–405 instructs as to its application:

> [Section 3–405] extends [the former rule] to include the padded payroll cases, where the drawer's agent or employee prepares the check for signature or otherwise furnishes the signing officer with the name of the payee. The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection ... of his employees.

U.C.C. § 3–405, cmt. 4 (1989). The policy underlying section 3–405 is thus to place the risk of loss of forgery on the party in the best position to avoid or insure against such loss. *See, e.g., Fidelity & Casualty Co.,* 675 S.W.2d at 318 ("The general purpose of the Code is to allocate the loss, among innocent parties, to the person who is closest to the individual causing the loss and who, presumably, has the best opportunity to prevent it."); *City of Phoenix,* 712 P.2d at 971 ("In the [§ 3–405(1)(c)] situation, the party best able to prevent the loss is the employer where 'the wrong-doing is internal [and] it is arguably within the drawer's ability to set up a system of controls and safeguards to prevent the embezzlement.'") (quoting R. Harbus, *The Great Pretender—A Look at the Imposter Provision of the Uniform Commercial Code,* 47 Cin.L.Rev. 385, 395 (1978)); *McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750, 759–60 (3d Cir.1990) (normally the employer is in a better position to prevent financial abuses by its employees or ameliorate the consequences).

As indicated by the language of section 3–405(1)(c), if the defense applies to the facts of a given transaction, the result is to render the forged signature effective to transfer good title as if no forgery had occurred. *See Prudential–Bache Sec., Inc. v. Citibank, N.A.,* 73 N.Y.2d 263, 539 N.Y.S.2d 699, 702, 536 N.E.2d 1118, 1121 (1989); *City of Phoenix,* 712 P.2d at 969; *Fidelity & Casualty Co.,* 675 S.W.2d at 318; *Kraftsman Container Corp.,* 404 A.2d at 1291; *see also* James J. White & Robert S. Summers, *Uniform Commercial Code* § 16–4, at 701 (3d ed. 1988) [hereinafter White & Summers] ("a good faith transferee of one covered by 3–405 may be a holder in due course"). According to the Utah high court, when the fictitious payee defense applies, the result is that "the check is deemed to be payable to bearer, and an endorsement of the payee's name on the check is not forgery." *Braswell Motor Freight Lines, Inc. v. Bank of Salt Lake,* 28 Utah 2d 347, 502 P.2d 560, 562 (1972); *but see* U.C.C. § 3–405, cmt. 1 (1989) (instrument is not made payable to bearer; indorsements are still necessary to negotiation but any party can effectively indorse in the name of the payee).

For the defense to apply, an employee or agent of the drawer must "supply" the name of the payee to the drawer, and the faithless employee must intend that the payee have no interest in the instrument. Utah Code Ann. § 70A–3–405(1)(c) (1990). Although the defense commonly has been referred to as the "fictitious payee" defense, the payee named on the check need not be a fictitious person or entity. " 'It is immaterial whether a person with the name of the payee actually exists or whether the name is in fact a wholly fictitious name.' " *Fidelity & Casualty Co.*, 675 S.W.2d at 318 (quoting Bender's Uniform Commercial Code § 3.08[3] (1984)); *see also* White & Summers, § 16–4, at 701 ("a party who wishes to steal from his employer can draw a check payable to the order of some imaginary person . . . or he can draw a check payable to the order of a real person but never give the check to that person"). Moreover, courts applying the defense have liberally construed the term "supply." "An employee 'supplies' the name of the payee if he 'starts the wheels of normal business procedure in motion to produce a check for a nonauthorized transaction.' " *Fidelity & Casualty Co.*, 675 S.W.2d at 318 (quoting *Continental Bank v. Wa–Ho Truck Brokerage*, 122 Ariz. 414, 595 P.2d 206, 213 (Ct.App.1979)); *see also* White & Summers, § 16–4, at 702–03 (section 3–405(1)(c) covers employees having authority to submit names and procure checks even though the work of those persons is several steps removed from the check writing process). Indeed, in *New Amsterdam Casualty Co. v. First Pennsylvania Banking & Trust Co.*, 451 F.2d 892 (3d Cir.1971), a stock broker who used normal business procedures to fraudulently induce his employer to issue false checks payable to actual clients, and who subsequently intercepted and indorsed those checks was held to have "supplied" the name of the payee within the meaning of section 3–405. *Id.* at 897.

Thus Wasatch argues that the fictitious payee defense of section 3–405(1)(c) applies to the undisputed facts of the present case. Erb, an employee of the drawer of the check, "supplied" the name of the payee within the meaning of the statute and obviously intended that the named payee have no interest in the checks. He then procured the checks and fraudulently indorsed them for deposit into his account at Wasatch. Wasatch accordingly argues that the effect of Erb's actions was to validate the forged indorsements and to allow good title to pass to Wasatch thereby extinguishing Wasatch's liability for the transaction.

Shearson counters with two responses. First, Shearson argues that section 3–405 cannot be invoked as a defense unless the party seeking its protection has acted in "good faith." Shearson alleges that Wasatch failed to act with the requisite good faith because (1) Wasatch apparently made no attempt to verify Erb's authority to negotiate checks payable to ABP Investments for deposit into his personal account; (2) Wasatch personnel knew that Erb was employed by the drawer of the check and should have been alerted thereby to the irregularity of the transaction; (3) the large amounts [5] of the checks were inconsistent with Erb's prior account history; (4) the amounts of the checks exceeded the dollar amount that could be deposited without officer approval according to internal bank policy and such approval was not obtained; (5) Wasatch personnel otherwise failed to comply with bank policy in that tellers were warned specifically to be wary of fraudulent schemes such as Erb's; (6) Wasatch, through its representatives, acted in its own commercial self interest at the expense of other parties to the transactions; and (7) throughout the course of the transactions, Wasatch remained consciously and deliberately ignorant of its duties and responsibilities with respect to verifying the authenticity of the indorsements and refusing to negotiate the checks over forged indorsements.

Alternatively, Shearson argues that, even assuming section 3–405 applies to bar

---

**5.** The checks deposited by Erb at Wasatch initially were for amounts as large as $60,000.

Dep. of Jeannine Nelson, Ex. 2.

Wasatch's liability to Shearson as the drawer of the check, the defense is not available to the collecting bank in a suit by the payee of the check. Because under the settlement agreement executed by the parties Shearson acquired the rights of Wordperfect, Shearson argues that it stands in the position of the payee, and section 3–405 is therefore inapplicable to preclude Wasatch's liability.

### A. Good Faith and Negligence Under Section 3–405(1)(c)

■ Both Wasatch and Shearson acknowledge the rule universally recognized by courts applying section 3–405 that the party seeking to invoke the protection of the defense must have acted in good faith in accepting an instrument over a forged indorsement. *See, e.g., Consolidated Pub. Water Supply Dist.,* 686 S.W.2d at 851 ("The obligation of good faith which § 1–203 imposes upon the performance or enforcement of every contract or duty within the U.C.C. is applicable to transactions to which § 3–405 is applicable."); *City of Phoenix,* 712 P.2d at 970 ("Although there is no good faith requirement specifically set forth in [§ 3–405], banks are obligated to act in 'good faith' in all contracts and duties by [§ 1–203]"); *McAdam v. Dean Witter Reynolds,* 896 F.2d at 761 (defendant must have acted in good faith to invoke defense); *McCarthy, Kenney, & Reidy,* 524 N.E.2d at 393 (same); *British Caledonian Airways, Ltd. v. First State Bank,* 819 F.2d 593, 596 (5th Cir.1987) (same); *cf. Northbrook Property & Casualty Ins. Co. v. Citizens & S. Nat'l Bank,* 184 Ga.App. 326, 361 S.E.2d 531, 532 (1987) ("Only bad faith by a bank prevents invoking [section 3–405] to defeat a claim."). In applying and construing section 3–405, the Utah court has indicated that "[t]here is no suggestion that the [defendant] bank knew of any fraudulent scheme or acted in bad faith in its dealings with the depositor." *Braswell,* 502 P.2d at 562. The implication of this statement is that, under Utah law as well as the majority rule, section 3–405 is unavailable as a defense to a party acting in bad faith.

The parties disagree, however, in their respective views of how to define good faith in the context of check negotiation and whether Wasatch acted in good faith under the present facts. Shearson argues that a bank does not act in good faith when the bank acts negligently or out of commercial self interest. Shearson relies on *E.F. Hutton & Co. v. City National Bank,* 149 Cal.App.3d 60, 196 Cal.Rptr. 614 (1983), for the proposition that a collecting bank's negligence in paying over a forged indorsement will preclude its invocation of the section 3–405 defense. In that case, the California Court of Appeal held that "[w]hen the collecting bank is confronted with obviously suspicious circumstances and could have reasonably foreseen the plaintiff's loss, the padded payroll provisions ... cannot be invoked and the defendant [becomes] subject to general negligence liability." *Id.* 196 Cal.Rptr. at 620 (citation omitted). Similarly, the Eighth Circuit, applying Nebraska law, more recently has determined that the following negligent activities by a defendant bank precluded a section 3–405 defense: (1) maintenance of a check cashing policy that was inadequate because tellers were not required to inspect checks or to insure that the name of the payee corresponded to the name of the indorser; (2) accepting checks for deposit despite bank employees' knowledge that the depositor had an unstable financial history; (3) failure of employees to question the depositor about the depositor's authority to cash checks payable to a person other than the depositor; and (4) payment over corporate indorsements that were handwritten, frequently misspelled and bore no officer's co-indorsement. *Wymore State Bank v. Johnson Int'l Co.,* 873 F.2d 1082, 1086–87 (8th Cir.1989).

Shearson argues that Wasatch's conduct in connection with the ABP Investment checks was negligent because the checks contained a handwritten commercial indorsement, because there was no verification of Erb's authority to negotiate the checks, because the bank failed to follow its own policies, and because of other facts that closely parallel the facts of *Wymore.* Shearson would have the court conclude

that such negligence, assuming it is such, constitutes bad faith and precludes the application of section 3–405.

The rule that a collecting bank's negligence precludes a section 3–405 defense has been adopted by only two jurisdictions. *See E.F. Hutton,* 196 Cal.Rptr. at 620; *Travelers Indem. Co. v. Center Bank,* 202 Neb. 294, 275 N.W.2d 73, 75 (1979); *Wymore State Bank v. Johnson Int'l Co.,* 873 F.2d 1082, 1085 (8th Cir.1989) (applying Nebraska law); *but cf. Drexel, Burnham, Lambert, Inc. v. 11 Stone Street Corp.,* 156 A.D.2d 121, 548 N.Y.S.2d 881, 882 (1989) (section 3–405(1)(c) inapplicable because collecting party was careless and negligent and therefore failed to act in good faith); *Board of Higher Educ. v. Bankers Trust Co.,* 86 Misc.2d 560, 383 N.Y.S.2d 508, 511 (Sup.Ct.1976) (collecting bank liable if it acts with gross negligence or commercial bad faith as manifested by bank's failure to comply with its own policies or reasonable commercial practices). In fact, the *E.F. Hutton* holding that simple negligence on the part of the collecting bank precludes a section 3–405 defense to causes of action other than breach of warranty [6] has been specifically rejected, *Consolidated Pub. Water Supply Dist.,* 686 S.W.2d at 853, and classified as the minority position. *Northbrook Property & Casualty Ins. Co.,* 361 S.E.2d at 532.

The overwhelming majority of jurisdictions considering the question have determined that a collecting bank's simple negligence will not bar a section 3–405 defense to claims resulting from the collecting bank's acceptance of a check over a forged indorsement where the defense is otherwise applicable. *See, e.g., Prudential–Bache Sec. v. Citibank,* 539 N.Y.S.2d at 705, 536 N.E.2d at 1124 ("bank's negligence is irrelevant under UCC 3–405(1)(c)"); *McCarthy, Kenney, & Reidy,* 524 N.E.2d at 393 ("Most courts have recognized the immateriality of the negligence of a bank in circumstances covered by § 3–405(1)(c)."); *City of Phoenix,* 712 P.2d at 970 ("negligence is irrelevant to a [§ 3–405]

defense"); *Kraftsman Container Corp.,* 404 A.2d at 1292 ("Simple negligence on the part of a bank should not, and has been found not to affect the operation of § 3–405"); *Northbrook Property & Casualty Ins. Co.,* 361 S.E.2d at 532 ("overwhelming majority" of jurisdictions confronted with this issue recognize that loss should fall on the employer and negligence on the part of the bank is irrelevant); *Consolidated Pub. Water Supply Dist.,* 686 S.W.2d at 852 (bank free from the consequences of its own ordinary negligence when it pays an instrument over a forged endorsement in a situation covered by § 3–405); *Prudential Ins. Co. v. Marine Nat'l Exch. Bank,* 371 F.Supp. 1002, 1003 (E.D.Wis.1974) (bank's alleged negligence is not relevant). The Tenth Circuit Court of Appeals, applying New Mexico law, similarly held that the " 'conspicuous ... absence' in § 3–405 of a requirement that the bank exercise ordinary care ... leads to the conclusion that the drafters of the Code purposely intended that under the circumstances outlined in § 3–405 the drawer would be liable without regard to the bank's negligence." *Western Casualty and Sur.,* 676 F.2d at 1347 (quoting *Prudential Ins. Co. v. Marine Nat'l Exch. Bank,* 371 F.Supp. 1002, 1003 (E.D.Wis.1974)). The court explained its holding:

Section 3–405 does not explicitly impose a standard of care on banks that assert the section as a defense, and the New Mexico courts have not yet confronted this issue. Of course, the obligation of all parties to act in good faith is explicit in the Code's general provisions, ... While it is clear that banks must observe this standard of good faith, whether they must also be free from negligence to invoke the protection of § 3–405 is unclear. Two other sections of the Code that deal with forged signatures specifically incorporate a standard of care for banks [referring to sections 3–406 and 4–406].... Under these two sections, the negligent drawer can defeat the bank's defenses to a forgery by showing that

---

**6.** Even under *E.F. Hutton,* notwithstanding its negligence, the collecting bank can still invoke

section 3–405 as a defense to a breach of warranty claim. *E.F. Hutton,* 196 Cal.Rptr. at 621.

the bank acted negligently. No similar qualifying language is incorporated in § 3–405.

*Id.*

Although the collecting bank's simple negligence will not bar the defense, under section 1–203[7] of the Code, all banking transactions must be performed in good faith. In the fictitious payee context as well as in other Code situations, the standard of good faith is defined by section 1–201(19) as "honesty in fact in the conduct or transaction concerned." Utah Code Ann. § 70A–1–201(19) (1990); *see also Western Casualty & Sur.*, 676 F.2d at 1347; *Consolidated Pub. Water Supply Dist.*, 686 S.W.2d at 851; *British Caledonian Airways*, 819 F.2d at 596; *Kraftsman Container Corp.*, 404 A.2d at 1291; *McCarthy, Kenney, & Reidy*, 524 N.E.2d at 393; *cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chemical Bank*, 57 N.Y.2d 439, 456 N.Y.S.2d 742, 747, 442 N.E.2d 1253, 1258 (1982) ("a drawee bank surely is not immunized by section 3–405 when it acts dishonestly"). The Code's "honesty in fact" good faith standard "is generally interpreted as a subjective test of honest [sic]. . . . It is a test of whether the bank had actual knowledge of dishonesty— sometimes referred to as the 'white heart and empty head' standard." *City of Phoenix*, 712 P.2d at 970 (citations omitted); *see also British Caledonian Airways*, 819 F.2d at 596 (test for good faith is actual belief of the party in question, not the reasonableness of that belief). Accordingly, absent some indication that the bank has acted in a subjectively dishonest or intentional manner in improperly accepting a check over a forged indorsement, the bank will be held to have acted in good faith. *See, e.g., Consolidated Pub. Water Supply Dist.*, 686 S.W.2d at 851 (no evidence that bank or its employees intentionally participated in the scheme to defraud or knew of the fraudulent conduct); *City of Phoenix*, 712 P.2d at 972 ("Mere negligence or knowledge of suspicious circumstances is not sufficient to show bad faith."); *cf. Prudential–Bache Sec. v. Citi-*

*bank*, 539 N.Y.S.2d at 705–06, 536 N.E.2d at 1124–25 (bank acts dishonestly where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in a fraudulent scheme).

Thus a bank's failure to follow commercially reasonable banking procedures or to comply with its own policies generally will not constitute a lack of good faith. The cases are illustrative. In *McCarthy, Kenney, & Reidy*, the Massachusetts Supreme Judicial Court held that the defendant bank's acceptance of checks with typed commercial indorsements and its failure to inspect indorsements might have been negligent or commercially unreasonable conduct, but it did not constitute dishonesty in fact because the bank had no subjective knowledge of the forgeries. 524 N.E.2d at 393. Similarly, in *British Caledonian Airways*, the Fifth Circuit concluded that a collecting bank acted in good faith although it accepted checks where: (1) the initial and subsequent restrictive endorsements were in the same handwriting; (2) the checks were negotiated in contravention of restrictive endorsements; (3) the checks were for large amounts; (4) the bank failed to follow its own policy governing negotiation of large checks; and (5) indorsements were misspelled. 819 F.2d at 597–98. Finally, in *Merrill Lynch v. Chemical Bank*, the New York Court of Appeals held that indorsement irregularities including a handwritten corporate indorsement, an illegible endorsement, corporate endorsements in blank, and second indorsements of unrelated persons or entities did not amount to dishonesty on the part of a bank such that section 3–405 was not available. 456 N.Y.S.2d at 747, 442 N.E.2d at 1258; *but see Kraftsman Container Corp. v. United Counties Trust Co.*, 169 N.J.Super. 488, 404 A.2d 1288, 1293 (Law Div.1979) (bank may be acting in bad faith if it pays over illegible and nonexistent indorsements repeatedly during an extended period and bank's conduct was so

---

**7.** "Every contract or duty within this act imposes an obligation of good faith in its performance

or enforcement." Utah Code Ann. § 70A–1–203 (1990).

irregular that it failed to demonstrate honesty-in-fact); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 762 (3d Cir. 1990) (collecting bank acted in bad faith by deliberately violating its own policies in cashing 120 extremely large third-party checks totalling between $3–4 million). Other courts have determined that a bank's alleged failure to adequately train and supervise its personnel does not equate to a lack of good faith if, because of such inadequacies, the bank fails to detect the perpetration of a fraudulent scheme. *See Calisch Assoc., Inc. v. Manufacturers Hanover Trust Co.*, 151 A.D.2d 446, 542 N.Y.S.2d 644, 646 (1989); *Retail Shoe Health Comm'n v. Manufacturers Hanover Trust Co.*, 160 A.D.2d 47, 558 N.Y.S.2d 949, 952 (1990).

The position of the Utah courts regarding good faith and the circumstances under which section 3–405 is unavailable as a defense is in general accord with the majority rules set forth above. In *Braswell*, the court noted: "There is no suggestion that the bank knew of any fraudulent scheme or acted in bad faith in its dealings with the depositor. . . . As to the meaning of the term 'bad faith' see *Sugarhouse Finance Company v. Zions First National Bank*, 21 Utah 2d 68, 440 P.2d 869 (1968)." *Braswell*, 502 P.2d at 562. In *Sugarhouse Finance*, the Utah court defined "good faith" for purposes of the Uniform Fiduciaries Act:

> The [Uniform Fiduciaries Act] does not define "bad faith." However, it defines "good faith" as being done honestly, whether it is done negligently or not. "Bad faith" is the antithesis of good faith and has been defined in the cases to be when a thing is done dishonestly and not merely negligently. . . . It is also defined as that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest.

*Sugarhouse Fin. Co. v. Zions First Nat'l Bank*, 21 Utah 2d 68, 440 P.2d 869, 870 (1968). Thus the Utah good faith requirement is essentially identical to the majority rule in that it requires subjective honesty in fact and negligence is irrelevant.

Applying these standards to the present case, no evidence supports Shearson's allegation that Wasatch acted in bad faith such that section 3–405 is unavailable as a defense against Shearson's claims. The evidence adduced thus far is inconclusive as to the precise circumstances attending the Erb–Wasatch transactions and regarding the specifics of Wasatch's established policies governing the deposit of checks into a personal account over a commercial indorsement. Nevertheless, even assuming the veracity of Shearson's allegations, nothing has been alleged that would negate Wasatch's claim that it acted in good faith throughout the course of the Erb transactions. Each of the facts that Shearson relies on to prove Wasatch's bad faith fits within one of three general categories. First, Shearson focuses on the irregularities in the indorsements and the transaction, and the alleged failure of the bank to adequately investigate those irregularities. Erb indorsed in his own handwriting the name of the commercial payee. He failed to affix his own name on the indorsement as the depositor. The Wasatch employees who dealt with Erb apparently failed to ascertain his authority to negotiate the checks and relied on their personal experiences with Erb in assuming the legitimacy of the transactions. Moreover, the amounts of the checks, initially as large as $60,000, logically might have notified a reasonable bank employee of the need for heightened vigilance. Finally, although disputed factual issues remain, Wasatch's employees arguably failed to comply with Wasatch's check acceptance policies. Even assuming the veracity of these facts, however, they are neither singularly nor cumulatively a sufficient factual basis for the inference that Wasatch did not act in good faith. At most, they constitute negligence, although the court makes no pronouncement to that effect. None of the facts alleged suggest that Wasatch or its employees subjectively intended to facilitate Erb's scheme or had actual knowledge of the perpetration of the fraud. In such cases, section 3–405 places the loss on the employer of the faithless employee.

 Shearson next seizes upon the "motive of self-interest" language from *Sugarhouse* and contends that because Wasatch manifested a motive of self-interest in its treatment of Erb, it acted in bad faith. In this respect, Shearson argues that the employees of Wasatch knew Erb, knew that he was a frequent depositor whose transactions historically had been legitimate, and knew that his account was one of the larger consumer accounts at the bank. Because of this "preferred" status enjoyed by Erb, his transactions were handled with dispatch and without questioning the authenticity of his indorsements—even when significant dollar amounts were involved in the transactions and bank policy required extra precautions. Shearson thus argues that Wasatch's actions in according Erb preferential treatment constituted bad faith because its motive was its own commercial self-interest and the retention of profit-generating accounts. The flaw in Shearson's argument is that it reads too much into the *Sugarhouse* language defining bad faith as acting in one's own self-interest. Were Shearson's interpretation of that language to be adopted, *every* profit-oriented commercial activity would constitute self-interest and bad faith. Absent some evidence of a more pernicious motive, merely treating valued customers as such by allowing them special privileges not afforded to others will not be construed as commercial bad faith.

 Finally, Shearson argues that Wasatch's bad faith is manifested by the bank's deliberate effort to avoid discovery of the irregularities in Erb's transactions. Shearson relies on *Jaeger & Branch, Inc. v. Pappas*, 20 Utah 2d 100, 433 P.2d 605 (1967), in which the Utah Supreme Court affirmed a trial court's conclusion that the plaintiff, the indorsee of a commercial check, had not received sufficient notice of irregularity in an instrument so as to preclude holder in due course status. The court stated that

> when one who takes a negotiable instrument is aware of any fact which should alert him that there is a defense, he cannot close his eyes and ignore it. He must act in good faith and exercise such caution as a reasonable person would under those circumstances and is chargeable with knowledge of such facts as reasonable inquiry would disclose.

*Id.*, 433 P.2d at 607. The focus of the *Jaeger* court was determining when a holder takes an instrument with notice of defenses or irregularities in the instrument and not bad faith under section 3–405. Nevertheless, a bank's conscious and deliberate decision to remain ignorant of the existence of a fraudulent scheme despite irregularities on the face of a transaction can constitute bad faith. Such conduct bridges the gap between negligent and intentional conduct and should subject to the bank to liability. There is no allegation or evidence in the present record, however, that Wasatch or its employees perceived specific irregularities in the checks and made a wilful and deliberate decision not to investigate those irregularities. Several Wasatch employees have testified that Erb received preferential treatment, specifically that his transactions were not subjected to the same scrutiny as those of other clients. No doubt such conduct manifested a conscious decision to treat Erb preferentially. But such a decision does not constitute wilful ignorance unless the decision is based upon specific irregularities in specific transactions. Here, the decision to treat Erb preferentially resulted not from a decision to disregard perceived irregularities in specific transactions, but pre-dated the suspect transactions and was addressed to Erb's account in general. Consequently, Wasatch has not been shown to have acted in bad faith.

To summarize, there remain factual disputes regarding whether Wasatch acted negligently in accepting checks from Erb. As to the material facts relating to Wasatch's good faith or lack thereof, there is no dispute because no fact has been alleged which, even assuming its veracity, would lead to the conclusion that Wasatch acted in bad faith. Wasatch's section 3–405 defense is not therefore precluded by that claim.

### B. Section 3–405 as a Defense Against Payees

Shearson next contends that the fictitious payee defense is limited in application to situations where the *drawer* or its agent attempts to recover for losses resulting from the acts of the drawer's employee. Shearson asserts that under the settlement agreement between it and Wordperfect, it acquired all rights of Wordperfect, Utah Softcopy and the Wordperfect principals. Accordingly, as plaintiff, Shearson argues that it stands in the position of both drawer of the checks and payee, and even assuming that section 3–405 is a valid defense against the claims of the drawer, the defense is inapplicable when the plaintiff is the payee.

 The Utah court apparently has had no opportunity to construe the scope of section 3–405 and whether the defense precludes the claims of a payee as well as a drawer in the faithless employee situation. The court must therefore decide the issue based on its assessment of how the Utah court would resolve it.

Shearson relies on *Barnett Bank v. Lipp,* 364 So.2d 28 (Fla.Ct.App.1978), in which the court concluded that section 3–405 provides no defense against a claim brought by the payee of a check against the collecting bank. *Id.* at 29–30. In a later case, the Third Circuit similarly concluded that section 3–405 does not preclude the claims of a payee against a collecting bank even when the drawer's claims would be barred. *McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750, 760 (3d Cir.1990). The court offered the following explanation for its holding:

> The rationale for the § 3–405(1)(c) exception, however, does not easily extend to lawsuits brought by *payees* against initial collecting banks. A payee, unlike the drawer/employer, is not in a better position than the bank to prevent such financial abuses. The faithless employee is not the payee's employee. Consequently, the payee can not prevent such abuses through careful hiring or supervising practices. Nor can the payee spread the risk of forgery losses throughout society by means of fidelity insurance. Importantly, as between the payee and an initial collecting bank, the bank is clearly in a better position both to prevent, or minimize, forgery losses through proper and careful banking procedures, ... and to socialize the cost of forgery losses by incorporating insurance costs into its banking charges.

*Id.* (citations omitted; emphasis in original). The *Barnett Bank* decision was founded on similar logic. 364 So.2d at 30.

For at least three reasons, the position taken by the courts in *Barnett Bank* and *McAdam* is inconsistent with the intent and policy of section 3–405. First, as is noted above, the payee named on the instrument that is the product of the "faithless employee" or "fictitious payee" scenario need not be a fictitious person or entity. An actual person or entity to whom the drawer is legitimately indebted may be the payee. As the structure of the statute manifests, the important consideration is not whether the payee actually exists, but whether the faithless employee intends that the payee take no interest in the check. Thus the actual existence of the person or entity named as payee is simply irrelevant under section 3–405. *See Northbrook Property & Casualty Ins.,* 361 S.E.2d at 532. Under the rule of *Barnett* and *McAdam,* the mere fortuity that the faithless employee elects to use the name of an existing person or entity as the payee forecloses the application of section 3–405 if the named payee consents to participate in the litigation as a party plaintiff or assigns its rights to the drawer. If, on the other hand, the faithless employee uses a fictitious payee, the defense is viable. In either situation, the faithless employee's culpable conduct that is the target of section 3–405 is identical, but the results are dramatically different. Fidelity to the intent of section 3–405 demands that the court avoid such an arbitrary result.

Second, as a matter of law, if the facts otherwise support application of section 3–405(1)(c), the named payee has no legal standing as a plaintiff. The payee will never have received an interest in the in-

strument and therefore will not have a viable claim against the collecting bank; the issue of a section 3–405 defense is therefore mooted. *See Federal Ins. Co. v. First Nat'l Bank*, 633 F.2d 978, 983 (1st Cir.1980). Finally, adoption of the position advocated by *Barnett Bank* and *McAdam* is imprudent because it would allow drawers of checks to easily circumvent the loss allocation scheme of section 3–405, at least in cases involving an actual but unintended payee. A drawer of a check whose faithless employee induced the issuance of the check and who realized that section 3–405 would prevent the drawer from shifting the loss to the collecting bank could simply have the payee assign the payee's rights to the drawer. Then, as in the present case, the drawer could legally stand in the shoes of both the drawer and the payee of the check. The policy of section 3–405 is unambiguous—the employer of a faithless employee will bear the loss associated with that employee's misconduct in the prescribed circumstances. That policy should not be subverted or circumvented by simply manipulating legal standing through assignment.[8]

C. Scope of Section 3–405

Having determined that section 3–405(1)(c) governs the present case and allocates the risk of loss stemming from the activities of Shearson's faithless employee, the final issue presented is the scope of the defense and to what extent it precludes Shearson's four causes of action for negli-

gence, breach of warranty,[9] monies had and received, and conversion.

When applicable to the facts of a given case, section 3–405 is an absolute defense to claims by the drawer of the check against the collecting bank for negligence, breach of warranty, monies had and received and conversion. In the case of the common law negligence action, section 3–405 simply displaces the cause of action. *See, e.g., Hinkle v. Cornwell Quality Tool Co.*, 40 Ohio App.3d 162, 532 N.E.2d 772, 782 (1987) ("[§ 3–405] displaces any negligence claims against the depositary bank, common law or otherwise"); *McCarthy, Kenney, & Reidy*, 524 N.E.2d at 392 ("the drafters of the Code and the Legislature intended to eliminate common law negligence actions against the drawee bank in fictitious payee situations"). The rationale for the rule was explained in *Consolidated Public Water Supply District:*

> To hold that one may use a common law negligence action to recover in a padded payroll case is to allow § 3–405 to become a virtual nullity. It is inconceivable that those who drafted the U.C.C. intended to forbid recovery under the Code, but to permit the same remedy for the same wrong outside the Code. Section 1–103 intended the common law to supplement, not contradict, the other provisions of the U.C.C.

686 S.W.2d at 853. Common law causes of action for monies had and received and conversion are similarly precluded if section 3–405 applies. *See, e.g., Prudential-*

---

**8.** The *McAdam* court implicitly acknowledged this principle by its remark that "[t]here appear then to be good reasons for allowing payees to sue initial collecting banks despite § 3–405(1)(c), *at least when the payee is not simply serving as a litigation front for a drawer/employer who has been the victim of a faithless employee.*" *McAdam*, 896 F.2d at 760 (emphasis added).

**9.** Shearson has not yet indicated whether the basis for its breach of warranty cause of action is the U.C.C. or the common law. The more obvious interpretation of the cause is that it is premised on section 4–207(1)(a), which provides, in part:
> (1) Each customer or collecting bank who obtains payment or acceptance of an item and

each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that
> (a) he has a good title to the item.

Utah Code Ann. § 70A–4–207(1)(a) (1990). If, indeed, Shearson's claim is statutorily based, there is a serious fundamental question regarding whether the warranties recognized by section 4–207 run to the drawer of a check or only to the payor bank. Resolution of the issue will depend upon the breadth of the interpretation of the "or other payor" language of the statute. The parties acknowledge that the authorities are mixed on this point and, in light of the court's ultimate disposition of the motion, the court declines to address that issue.

*Bache Sec. v. Citibank*, 539 N.Y.S.2d at 704, 536 N.E.2d at 1123 ("UCC 3–405(1)(c) cannot be circumvented by claims for conversion and money had and received"); *Fidelity & Casualty Co.*, 675 S.W.2d at 319 (section 3–405 barred plaintiff's claims for conversion, negligence and money had and received). Finally, the fictitious payee defense also operates to bar breach of warranty causes of action. As the Texas Court of Appeals has explained: "By shifting the loss to the drawer, the section precludes a collecting bank's liability on a [§ 4–207(a)(1)] warranty and a drawee's liability to its customer under [§ 4–401]." *Id.* at 318 (footnote omitted). Accordingly and as a matter of law, all of Shearson's claims against Wasatch are barred by section 3–405 and therefore are dismissed with prejudice.

## II. Conclusion

The "fictitious payee" defense as articulated in section 3–405(1)(c) of the Uniform Commercial Code operates under the facts of the present case to shield the collecting bank, Wasatch, from liability resulting from Erb's misconduct while in Shearson's employ. Erb deliberately induced the issuance of checks by Shearson. The payee named on those checks was never intended by Erb to take an interest in the checks. In such circumstances the mandate of the Code is clear—the drawer shall bear the loss resulting from the misdeeds of its employee. Wasatch's conduct in the relevant transactions raises serious questions about whether the bank discharged its duty to act in a commercially reasonable manner. Nevertheless, no fact has been alleged which would support the inference that Wasatch acted in bad faith so as to preclude the operation of the fictitious payee defense. Moreover, the defense is viable against Shearson whether Shearson stands in the position of the drawer of the checks or the payee. Finally, the defense is an absolute defense to both the statutory and common law causes of action alleged in the complaint. The court need not address the other grounds for Wasatch's motion and summary judgment is hereby GRANTED in favor of Wasatch and all counts of Shearson's complaint are hereby dismissed with prejudice.

IT IS SO ORDERED, ADJUDGED AND DECREED.